[Civ. No. 9419. First Appellate District, Division Two.—June 1, 1934.]

In the Matter of the Estate of ANTONIO TAMAGNO, Deceased. NATALE TAMAGNO et al., Appellants, v. GEORGE W. BRUNO, Respondent.

Andriano & Lowery, Myron Harris and Leo A. Sullivan for Appellants.

M. Martino and John L. McVey for Respondent.

STURTEVANT, J.—Antonio Tamagno died September 29, 1932, leaving a purported will. October 17, 1932, the will was admitted to probate. On January 24, 1933, Natale Tamagno and others filed a petition to revoke the probate of the purported will. The defendant answered and after trial the court made findings in favor of the defendant and from the decree entered thereon Natale Tamagno and the other petitioners have appealed.

In their brief the petitioners set forth numerous points. However, those points are but different methods of presenting the contention which in their reply brief they state as the sole question involved on this appeal—the sufficiency of the evidence introduced by the respondent. The respondent in answer concedes such to be the case. We will therefore address ourselves directly to that point.

In the shortest form the contention is this: In 1926 George W. Bruno was appointed guardian of Antonio Tamagno. He qualified and continued to act until the death of Tamagno. While defendant was acting as guardian, the decedent made his will on the twenty-fourth day of September, 1932, in favor of him, the said George W. Bruno. Relying on these facts the petitioners assert that the burden rested on George W. Bruno to assume the burden of proof

and establish the fact that no undue influence was exercised on the testator. This the petitioners assert Bruno did not do. In reply Bruno asserts that he did establish the fact and that the trial court found it in his favor and that said finding is conclusive on appeal.

For many years prior to 1926 the decedent had been a resident of Oakland. During the same time both George W. Bruno and his father had been residents of the same place. Tamagno at the time of his death was about seventy-five years of age. He was a native of Italy but had come to this country and engaged in the occupation of gardening. The record does not disclose that he ever married, but at one time he had brothers and sisters at Busala, Italy. For fifteen or twenty years before his death Tamagno had not received any communications from any of his kith or kin residing in Italy. He owned a lot on which was a small building in which he resided. A short time before August 10, 1926, a woman called at his residence and while on the premises suffered some injury for which she commenced an action claiming damages in the sum of $15,000. With the summons in his possession he called at the Fugazi Bank, of which George W. Bruno was manager, and discussed with the officers of the bank the fact that he had been sued. In that conversation he vigorously asserted that he had not caused the plaintiff any injury, that he was innocent of wrong, and if the plaintiff wanted his property she could take it and he would commence all over again. Mr. Bruno and others thereupon commenced to interest themselves in the affairs of Tamagno. The result was that after a hearing before the late Joseph S. Koford sitting as a probate judge, George W. Bruno was appointed guardian of Antonio Tamagno. Thereafter it transpired that the incompetent had on deposit in different banks $6,679 and that he also owned the real estate above mentioned. After the guardian was appointed the incompetent proceeded to do some gardening from which he received small amounts of compensation and did not make many withdrawals. However, when he appeared and asked for moneys they were paid to him at once.

For some years prior to his death Antonio Tamagno suffered from a cancer on his nose. At one time the appearance of the infection consisted of knobs the size of grapes.

Apparently sensitive of his appearance he was accustomed to remain closely at home. Early in July, 1932, the disease had developed to such an extent that the decedent went to a hospital. As soon as Mr. Bruno heard of the fact he made arrangements for Mr. Tamagno to be taken to Providence Hospital. There he underwent certain operations. He had the proper care of nurses and doctors and was furnished with proper food and medicines. Soon after he entered that hospital he stated to Mr. Bruno that he desired to make a will. At the same time he stated that he had relatives residing in Italy. Such facts as he gave to Mr. Bruno the latter repeated to Mr. Martino, an attorney at law associated with Mr. McVey, another attorney. Both of those attorneys had been attorneys for Mr. Bruno but, so far as we have noted, Tamagno had never had an attorney. Mr. Martino conferred with Mr. McVey and the latter drew a will which contained a clause, "I direct that my property and estate be disposed of in accordance with the laws of succession of the state of California." The will was witnessed by Dr. C. A. Queirolo and Mr. Martino on July 27, 1932. Mr. Martino speaks Italian, Mr. Tamagno did not speak Italian but spoke in the Genoese dialect, of which Mr. Martino had an understanding. Mr. Martino interviewed Mr. Tamagno and reported the data to Mr. McVey, who in turn drew the will. The record does not disclose any irregularity on the part of Mr. Martino, or Mr. McVey, and it does not disclose that Mr. Bruno took any part in getting that will executed as hereinabove stated. Almost daily thereafter Mr. Bruno called on his ward and attended to all of his wants. These calls continued down to about the middle of September. At that time Mr. Bruno went up on Russian River on a vacation. Miss Joyce was day nurse, Miss Loftus was night nurse. The doctors in attendance were Hamlin, Queirolo and Appeldorn. All of these witnesses were called by respondent and were examined and cross-examined. While Mr. Bruno was up country Mr. Tamagno stated to Miss Joyce that he wanted to see Mr. Bruno about making a will. Miss Joyce put in a telephone call which was transmitted to the residence of Mr. Bruno and when he returned to Oakland he took the will dated July 27, 1932, and went to the hospital. Mr. Tamagno told him he wanted that will destroyed and he wanted a will drawn that would leave

everything to Mr. Bruno. Thereafter Mr. Bruno communicated those instructions to Mr. McVey and a new will was drawn on September 24, 1932, which was witnessed by Charles A. Wilhelm and W. Dean Agnew. Mr. Wilhelm is attached to the office of Mr. McVey. Mr. Agnew is engaged in the insurance business and associated with Mr. Bruno. When the will had been prepared and was ready for signature, Mr. Bruno, Mr. Wilhelm and Mr. Agnew went to the hospital. For the purpose of seeing whether the patient could be seen Mr. Bruno went in alone and soon returned. Thereupon, he remained in the automobile and Mr. Wilhelm and Mr. Agnew went in and the will was executed. That will bequeathed all of the decedent's estate to Mr. Bruno and is the will under attack in this action. The respondent produced Mr. Wilhelm, Mr. Agnew and Mr. Bruno as witnesses and they were examined and cross-examined. At no place was any evidence developed that under any circumstances could be called undue influence. Miss Joyce testified that prior to the making of the will on September 24, 1932, Mr. Tamagno told her he wanted to make another will. She testified: "He said he wanted to get in touch with Mr. Bruno, he wanted to leave his money to Mr. Bruno so he could take care of him as long as he lived. He asked me to get in touch with Mr. Bruno." Mr. Wilhelm testified regarding the execution of the will. Among other things he stated: "There was nothing said by Mr. Agnew and Mr. Tamagno. I read the will and when I got through reading the will I asked Mr. Tamagno very positively whether he wanted to leave all his property to Mr. Bruno and he said, 'Yes, everything'. He waved his hands just like that, 'everything'. Then I asked him whether he wanted Mr. Agnew and myself to act as subscribing witnesses and he said 'Yes', and then we signed our names to the will." Mr. Agnew testified to the same effect. After Mr. Tamagno had executed the will the witnesses left the will in his possession and left the hospital. The next day Mr. Bruno called at the hospital and Mr. Tamagno handed him the will. The first will was destroyed by Mr. Bruno acting upon the request of the decedent. If we understand the record in this connection the fact is that the first will was destroyed the day before the last will was executed.

74

The petitioners assert that Mr. Tamagno did not understand English. Several witnesses testified that he did. Furthermore, at the time of the guardianship proceedings Mr. Tamagno appeared before Judge Koford and was by him asked many questions regarding his age, his health, his properties, and in particular about the lawsuit brought to recover damages. That examination discloses that Mr. Tamagno had a fair understanding of English words and the meaning thereof.

After Mr. Bruno was appointed guardian such proceedings were had in the damage case that it was compromised for a nominal sum. Considering all of the record, we think it is quite clear that the testator entertained a real attachment for Mr. Bruno whom he had known for many years and was deeply grateful to him for the management of his estate. We think it is also clear that the respondent must be sustained in his contention that he showed affirmatively that in making the last will the testator was not acting under undue influence of any kind or nature.

While it does not appear that the decedent had independent advice, that fact standing alone does not break down the other facts hereinabove recited. It was a circumstance for the trial court to consider and no doubt it was duly considered by that court.

The petitioners presented an additional question regarding costs. At the termination of proceedings at the end of the first day of the trial, respondent's attorney stated: "I would like to ask for an order that the daily record be written up and charged against the estate for the benefit of counsel on both sides and the court. The Court: Very well, the testimony may be written up, a copy for the proponent of the will and a copy for the contestants." Thereafter the respondent filed a cost bill which contained the following item: "Reporter's fees for preparation of transcript during the trial upon court order, $219.80." The petitioners moved to tax the costs by striking out said item. The motion was denied. At this time the petitioners contend that the trial court erred in denying their motion. Section 274 of the Code of Civil Procedure states the fees of the official reporter. Continuing among other things it contains the following passage: "The fees for reporting and for all other transcriptions ordered by the court to be

made must be paid by the parties in equal proportion, and either party may, at his option, pay the whole thereof; and in either case all amounts so paid by the party to whom costs are awarded must be taxed as costs in the case. The fees for transcripts and copies ordered by the parties must be paid by the party ordering the same . . . '' We think the point may not be sustained. If Mr. McVey had gone to the court reporter and made the statement to him directly, then the point might have support. However, *ex industria* for the purpose of protecting the rights of his client, he applied to the court and the court granted his motion and directed the transcription. The service rendered was therefore ''ordered by the court'' and the cost was recoverable.

We find no error in the record. The judgment and order appealed from are affirmed.

Nourse, P. J., and Spence, J., concurred.