[Sac. No. 4693. In Bank.—February 26, 1935.]

Q. C. GUIDICI, Respondent, v. NELLIE MALLEY GUIDICI, Appellant.

N. J. Barry for Appellant.

Green & Lunsford for Respondent.

THE COURT.—This action was instituted by the plaintiff to cancel and set aside a deed to certain real property situated in Sierra County, executed by him in favor of the defendant, on the ground, as alleged in the complaint, "that at the time of the making of said deed the plaintiff, due to his age and due to the fact of his protracted and excessive drinking of alcoholic liquors . . . was entirely incapable of understanding his act in the execution of said deed, and was possessed of a great weakness of mind and was subject to the imposition and undue influence of defendant". The court found this allegation of the complaint true, and further found that there was no consideration for the execution of said deed, and rendered judgment setting aside and canceling said deed. From this judgment the defendant has

appealed, and in support of her appeal contends that the evidence is insufficient to support the findings of the trial court.

The evidence in the case shows that at the date of the execution of said deed the plaintiff was sixty years of age, and that he owned and resided upon a farm near Loyalton, Sierra County. He had purchased the farm in 1913, paying therefor the sum of $16,000. He owned no other property, except a small amount of stock maintained on his farm at the date he executed said deed, and said real property was the sole source of his livelihood and sole means whereby he contributed to the support of his three children. He had been married some years before, but was divorced from his wife to whom was awarded the custody of their three minor children, to whose support the plaintiff had contributed the sum of thirty-seven and one-half dollars per month since the divorce. On the day the deed was executed, the plaintiff was driven in an automobile from his farm to Reno, Nevada. In the automobile were the defendant and two other persons, close friends of defendant, one of whom was the driver of the automobile. The trip to Reno was undoubtedly taken for the purpose of the plaintiff and defendant being married in said city. On arriving at Reno, and after considerable delay, the four persons met in the office of a lawyer for the purpose of having said deed prepared and executed. They found, however, that they had no description of the property to be conveyed. The lawyer suggested that they get married and have the deed executed later. The defendant objected, and refused to go on with the marriage ceremony until the deed was given. The party then returned to plaintiff's home for the purpose of getting a correct description of his land. After securing the same they retraced their steps to Reno, arriving in the evening about half-past 8 o'clock and going directly to the lawyer's office. There the deed was prepared and executed. They then arranged with a justice of the peace, and the plaintiff and defendant were married about 9:30 the same evening. Earlier in the day they had secured a marriage license. After attending a picture show they returned to plaintiff's farm, where the plaintiff and defendant spent the night. They lived together as man and wife about ten days. They then occupied separate rooms for a short

time when the plaintiff, on account of ill health, was forced to go to a hospital where he remained some weeks. A few days after the parties returned from Reno the plaintiff, on learning that defendant had a deed to his farm, demanded that she deliver up said deed to him, which she refused to do. The deed was dated November 12, 1930. This action was begun on February 14, 1931, soon after plaintiff's discharge from the hospital.

The plaintiff testified that he had been drinking excessively for ten days to two weeks prior to the date of said deed, and that he was so under the influence of intoxicating liquor that he had no recollection whatever of any of the occurrences which transpired on the trip to Reno, and no remembrance of signing or delivering said deed, or even of getting married to the defendant. That the plaintiff had indulged excessively in intoxicating liquor for some two weeks immediately prior to the date of said deed is borne out by a number of witnesses. One witness, a neighbor and intimate acquaintance, said that he saw the plaintiff six times during these two weeks and that on each occasion the plaintiff was drunk, that plaintiff asked him to ride with him, but he refused as he was afraid the plaintiff "would go into the ditch on account of his drunkenness". Plaintiff had whisky in his car and wine at his house. Another neighbor testified that he saw the plaintiff and defendant on November 7, 1930, at Reno; the plaintiff was staggering around and defendant was trying to put him in the car; plaintiff's condition was very low; he could hardly talk. The daughter of plaintiff saw him a few days before his marriage to defendant, and at that time "His eyes were stormy. I should judge that he had been drinking, or something, he acted nervous. He was driving down the street and he nearly ran over me." The cashier of the bank at Loyalton testified that he saw plaintiff two or three days before the deed was executed. He went down to the latter's house. Plaintiff was sitting in the front room with a quart jar of wine in a very drunken condition. He stayed a short time with plaintiff, during which time plaintiff not only drank all the wine in the quart jar but he filled it up again and drank from the jar after it was refilled. He gave his opinion that plaintiff was at that time "wholly incapable of doing any business". Dr. Lavery, who attended plaintiff

at the hospital during his sickness in January, 1931, said his symptoms were "restlessness and insomnia and unable to concentrate", and that his condition could have been due to alcoholism. He further stated that excessive and continuous drinking for a period of ten days to two weeks could often overthrow the judgment entirely. An eminent expert on nervous diseases, and a member of the faculty of Stanford Medical School, in answer to a hypothetical question involving the condition of the plaintiff at the time he executed said deed, stated, "I would say a man in that condition was not capable of conveying his property or transacting business. I would consider him incompetent and incapable, irresponsible." In addition to these witnesses, the notary who took plaintiff's acknowledgment to the deed, testified, "I asked him [plaintiff] if it was his signature and I don't remember if he said anything or not, and then I said, 'You acknowledge that as your free act and deed.' I said it kind of fast and he looked at me and did not say anything, and I don't think there was much said by anyone; his eyes indicated to me that he had signed the deed. I took it for granted that he had signed it." Continuing, this witness further testified in answer to questions asked of her, "I thought he acted kind of stunned, but I thought it was because he was a foreigner and could not understand English very well. . . . Q. You say he looked dazed? A. Yes, and kind of stupid; the kind of—that is, he struck me as being dazed and kind of stupid. . . . He acted kind of blank." All this evidence, aside from the testimony of the plaintiff, is corroborative of the evidence given by the plaintiff that at the time of signing said deed he was in such a state of mind, due to long and excessive drinking of intoxicating liquor, that he did not know what he was doing and that he had no recollection of signing the deed. This evidence without doubt was sufficient to support the finding of the trial court that the plaintiff at the time of the execution of said deed was mentally incapable, due to the protracted and excessive drinking of alcoholic liquors, of understanding the nature of his act in the signing and execution of said deed. It is conceded by defendant that if this finding is supported by the evidence the judgment based thereon is valid. ▆ The law upon this question is well settled and is stated as follows: "The rule that the person

alleging his incapacity should be bound by his contract because intoxication is his voluntary act was at first relaxed by allowing him to show that his condition was brought about by the other party. But a more rational view now prevails. The law now regards the fact of intoxication and not the cause of it, and regards that fact as affording proof of want of mental capacity. A completely intoxicated person is generally placed on the same footing as persons of unsound mind. One deprived of reason and understanding by reason of drunkenness is, for the time, as unable to consent to the terms of a contract as are persons who lack mental capacity by reason of insanity or idiocy. A person who at the time of making a contract is completely intoxicated may avoid his contract notwithstanding the fact that his intoxicated condition may have been caused by his voluntary act and not by the contrivance of the other party to the contract. . . . '' (6 Ruling Case Law, p. 595.)

It is true that there is evidence in the record that plaintiff was sober and possessed of all his mental faculties during the entire day on which he executed said deed, but this evidence only creates a conflict with that supporting said finding. Defendant contends that it is incredible that she could take the plaintiff forty-five miles from Loyalton to Reno, where they obtained the marriage license from the county clerk, and then back to Loyalton for the description of the property and afterwards return to Reno to the lawyer's office where the deed was prepared and then to the justice of the peace where the wedding ceremony was performed, without some of the parties concerned observing the condition of the plaintiff. It does not appear, however, that the county clerk or justice of the peace were called as witnesses at the trial. The two parties who accompanied the plaintiff and defendant on the trip to Reno were close friends of the defendant. It is true that the attorney who prepared the deed did not testify that he observed anything unusual in the appearance or actions of the plaintiff, but the notary who was also court reporter, and evidently a person of considerable standing, did observe the dazed condition of the plaintiff and his actions as one who was stupid or stunned. It may well be said that it seems incredible that a man of plaintiff's age and experience, while in his right mind, would convey practically all his property to the

defendant, or to any other person, without any monetary consideration, and thus deprive himself of the means of making a living for himself and providing for the support of his three children, which support he was obligated to furnish at the order of the court granting his divorce. This is not an action where a man has induced some young and inexperienced woman to marry him by conveying to her property and, thereafter becoming tired of his bargain, seeks to recover the property on the ground of undue influence or misplaced confidence. The defendant was a woman of over fifty years of age at the time. She had been married twice before, and she admitted that she was marrying the plaintiff as a business proposition. At no time did she manifest any affection toward the plaintiff. She evidently reposed but little confidence in him, or was aware of his intoxicated condition, as she absolutely refused, at the suggestion of the attorney, to proceed with the marriage ceremony until the deed to plaintiff's valuable farm was signed and delivered to her. These matters were undoubtedly given careful consideration by the trial judge who, after a review of all the evidence with the parties before him and an opportunity to observe their conduct and demeanor, believed the testimony of the plaintiff and his witnesses, and made findings favorable to him. According to the well-established rule in cases involving conflicting evidence, the findings of the trial court must be sustained on appeal.

It is not necessary for us to give any extended consideration to the further contention of the defendant that there is no evidence to support the finding of the trial court that there was no consideration for the deed. It is, of course, true that marriage is a good consideration for a deed, or for a contract generally, but if the deed was executed by the grantor at a time when he was incapable of understanding his act in the execution thereof, his marriage was entered into while in the same state of mind. If one was not binding upon him by reason of the fact that he was mentally incompetent of entering into a valid contract the other may be avoided for the same reason. In these circumstances it cannot be said that the marriage ceremony to which the plaintiff and defendant were parties formed a valid consideration for the execution of said deed.

The judgment is affirmed.