[Civ. No. 20793. First Dist., Div. One. July 23, 1963.]

MARY ALICE WALTON, Plaintiff and Appellant, v. THE BANK OF CALIFORNIA, NATIONAL ASSOCIATION, as Trustee, etc., et al., Defendants and Respondents.

DiMaria, Daschbach & Donovan, Philip A. DiMaria and William J. Moses for Plaintiff and Appellant.

Pillsbury, Madison & Sutro, Maurice D. L. Fuller, James Michael, Noble K. Gregory and William C. Miller for Defendants and Respondents.

SULLIVAN, J.—Plaintiff appeals from an adverse judgment in this action brought by her to rescind an irrevocable *inter vivos* trust. Additionally, plaintiff appeals from an order denying her motion to tax costs. We have concluded that the evidence is sufficient to support the findings and that the judgment should be affirmed. However, as we shall hereafter explain, we are of the view that the denial of plaintiff's motion to tax costs should be reversed.[1]

We set forth the following pertinent facts in accordance with the familiar rule that an appellate court will view the evidence in the light most favorable to the respondent and will indulge in all intendments and reasonable inferences to sustain the findings and the judgment. (*Peterson* v. *Grieger, Inc.* (1961) 57 Cal.2d 43, 51-52 [17 Cal.Rptr. 828, 367 P.2d 420]; *McCarthy* v. *Tally* (1956) 46 Cal.2d 577, 581 [297 P.2d 981]; *Monell* v. *College of Physicians & Surgeons* (1961) 198 Cal.App.2d 38, 47-48 [17 Cal.Rptr. 744]; *Clark* v. *Redlich* (1957) 147 Cal.App.2d 500, 504 [305 P.2d 239].)

On June 1, 1959, plaintiff Mary Alice Walton, a resident of Atherton, California, executed the trust agreement which is the subject of the present controversy. She was then a widow, 63 years old, with two grown children, a son and a daughter. Her husband had died in 1950. Her son Marvin, unmarried, usually lived with plaintiff. Her daughter Alice (Mrs. Moeckli) was married and had three children. (See footnote 1, *ante.*) As will appear, plaintiff was a person of substantial wealth.

By the trust agreement in question Mrs. Walton as trustor, without any consideration, transferred to the defendant Bank of California (hereafter referred to as the Bank) as trustee

[1]The following defendants appeared in the action: The Bank of California, National Association, trustee of the trust involved; Privact & Co., a partnership, nominee of the trustee to hold the trust assets; and the following remaindermen beneficiaries of the trust: Marvin Walton, plaintiff's son; Alice Clare Moeckli, plaintiff's daughter; the unborn issue and heirs of Marvin Walton appearing by their guardian *ad litem*; and Charlotte Moeckli, Randolph Moeckli and Steven A. Moeckli, minors, being the children of Alice Clare Moeckli, appearing by their guardian *ad litem*. The only defendants and respondents appearing on this appeal are the Bank of California, Privact & Co. and Alice Clare Moeckli.

most of her assets, consisting of securities, her residence in Atherton and a small amount of cash, all totalling approximately $500,000. The trust provided for the distribution of the entire net income to the trustor during her lifetime, with remainder over on her death to her two children equally. If the trust income, together with the trustor's income from other sources, should be insufficient to provide reasonable support, medical care and comfort for the trustor, the trustee may pay to or apply for the benefit of the trustor so much of the principal as it may deem advisable. The trust also provided: ''This trust is irrevocable, and no power is reserved to the Trustor to alter or amend any of its terms or to terminate it in whole or in part.''

The evidence in the record, which we need not detail, discloses that prior to the execution of the above trust plaintiff had a long history of admissions into various hospitals, sanitariums and rest homes. It is not disputed that over the period commencing September 7, 1947, and ending January 25, 1960, approximately two months before the commencement of the instant action, plaintiff was a patient in these various institutions on 31 separate occasions for varying periods of time. On 22 of these occasions she entered Twin Pines Sanitarium in Belmont, California. On February 14, 1951, while plaintiff was a patient at Twin Pines, guardianship proceedings were commenced on the petition of plaintiff's daughter, Mrs. Moeckli, in the course of which plaintiff was adjudicated an incompetent person and her daughter was appointed guardian of her person and estate. On May 1, 1953, on the petition of plaintiff's son, the guardianship was terminated and plaintiff was ordered restored to capacity.

The gist of the medical evidence explaining this unfortunate history is that plaintiff suffered from an anxiety neurosis, was subject to fits of depression, sought relief and escape in the use of alcohol and experienced an unpleasant relationship with her son Marvin, itself productive of additional tension and pressures. Dr. James, a specialist in psychiatry who attended plaintiff at Twin Pines off and on from 1950 to 1960 was called as a witness by plaintiff. He explained plaintiff's general basic problem as being threefold: ''Number one was an emotional condition that persisted throughout the years in variable degree [sic] of severity, diagnoses [sic] as anxiety reaction. Number two was the intemperate use of alcohol on many occasions which led to intoxication. Number three was

the alleged taking of pills and/or other medicines, such as camphor, bromides; and these were never fully substantiated by actual findings, but history that was brought up by various people." In his view, plaintiff's anxiety "is the type of psychoneurotic illness in which an individual under certain circumstances experiences certain types of distress. . . . This would be manifested by tremor, shakiness, unsteadiness on her feet. . . . I think it is important to point out that there is no thought disturbance with this type of illness. . . . In other words, by that I mean hallucinations, delusions, or ideas of reference." As this witness pointed out and as plaintiff's medical record at the above institution, which was received in evidence, discloses, plaintiff was admitted there on several occasions primarily for the excessive use of alcohol.

From time to time over the period 1950 to 1958[2] plaintiff was also treated by Dr. Heersema, a specialist in psychiatry, practicing in Palo Alto, who was called as a witness by the defendants. In the course of an extensive direct and cross-examination, Dr. Heersema developed the following background facts, among others, bearing upon plaintiff's problem: that at the outset he found a home situation of tension and some dissension; that his tentative diagnosis of plaintiff's condition when he first saw her was "anxiety neurosis and an anxiety tension state with some depression of symptoms"; that drinking was a release for what seemed to plaintiff an intolerable situation; that she was concerned over her son's respect or lack of respect for her; that a conflict had developed between plaintiff and her son which included cruel behavior and physical abuse on the part of the latter toward the former; that in January 1951 the witness arranged to have plaintiff taken to Twin Pines Sanitarium (she had been a patient there three times previously—once in 1947 and twice in 1950), advised the appointment of a guardian and testified in support of the petition thereafter filed; that shortly before plaintiff was restored to capacity in 1953, she asked the witness' advice about "establishing a trust," a suggestion made to her by a friend and the witness had told her it would provide protection and freedom from onerous decisions; and that thereafter in connection with the petition for restoration to capacity, the witness rendered an opinion that plaintiff was

---

[2]Dr. Heersema testified that he treated plaintiff over the period 1950 to November 1953; had no professional contact with her from then until March 1957; treated her again from March 1957 to January 1958; but did not have her as a patient thereafter.

in a suitable condition to be restored to management of her own estate and her own person.

Dr. Heersema testified that after an interval of almost two years he again saw plaintiff at his office on March 2, 1957; that his diagnosis at the time was "toxic malnutrition, masochistic neurotic, and that she was non-competent"; that plaintiff "was in a stressful stage and was very much agitated . . . and she was in a state of great anxiety and fear"; that she was nevertheless competent in a general way "knowing where she was and her relationships to the family"; that plaintiff had been admitted to Twin Pines in December 1957[3] and the witness recommended the continuance of such hospitalization—"it gives her this protection she needs with relation to the behavior of the son. . . . [e]ssentially, her reaction of anxiety and fear and attempt to please, and this was an attempt to please him, which as I say impaired her judgment"; and that plaintiff ceased to be a patient of his in January 1958.

This witness further testified that between plaintiff's restoration to capacity on May 1, 1953, and the last time he saw her as a patient in January 1958, he at no time found any lack of competency on her part in the sense of her understanding her family relationship and the nature and extent of her business affairs; and that in his opinion, plaintiff was at all times rational and competent except when she was under the influence of intoxicants to a high degree.

On November 10, 1958, plaintiff was admitted to the Marin Convalescent and Rehabilitation Hospital. Dr. Stone, called by the defendants, an internist but not a psychiatrist, testified that the admission diagnosis was "agitated depression." Plaintiff was discharged on January 31, 1959. In his opinion, she was at that time competent to handle her affairs. On April 8, 1959, she was readmitted to the same institution remaining there until May 3, 1959. At the time of such readmission she was "in severe state of agitated depression." During both periods of hospitalization, prescribed medication consisted of tranquilizers; during her second stay, the dosages were increased. Dr. Stone testified that when she was discharged on May 3, 1959, plaintiff, in his opinion, was capable of understanding her business affairs and other family affairs. He found no deficiency in her rationality or compre-

---

[3]The record shows she was a patient at Livermore Sanitarium from March to October 1957 and in a rest home in Redwood City in October and November 1957.

hension on the day she was discharged. It was during her second stay at the Marin Hospital that plaintiff's son left for Europe.[4]

With these general background facts stated, we turn to the occurrences immediately preceding plaintiff's execution of the controversial trust. At the outset it is to be noted that for many years plaintiff maintained with the defendant Bank of California an agency account for her investments.[5] From time to time plaintiff consulted with trust officers of the Bank, first with Mr. Parkinson and then with Mr. Proctor, concerning the securities in the account and possible investments. In May 1959, plaintiff, in the course of discussing her finances with her daughter, remarked that she had given both children a considerable amount of money and expressed some concern as to how plaintiff's future security might be affected. Mrs. Moeckli suggested that if plaintiff had any questions or concerns about financial matters she should contact Mr. Proctor. This she did by telephone on May 8 or 11. According to the testimony of Mr. Proctor, plaintiff wanted to know what she could do to protect herself from the invasion of the account and asked him what she could do to avoid this and "put the funds beyond her getting to them."[6] He explained to her that the only way he knew "was to put them in an irrevocable trust." This was the first time Mrs. Walton discussed the subject of a trust for her assets either with Proctor or anyone else. After starting to outline the features of such a trust, Mr. Proctor suggested "that we call on her and

---

[4]On April 21, 1959, during her second stay at the Marin Hospital, plaintiff made arrangements by telephone with an officer of the defendant Bank to give her son and daughter $5,000 each. On the same day she telephoned her attorney Mr. Charles to discuss with the latter a proposal made to her by her son that she go to Europe, take her securities with her, which were in an agency account at said bank, and thereafter turn them into cash for deposit in Swiss banks. Her attorney advised against it.

[5]Plaintiff first maintained a custody account; in 1945 changed it to an agency account. During the duration of the guardianship, the agency account was continued by Mrs. Moeckli as guardian.

[6]The witness testified: "I can't tell you the exact conversation, but the general conversation was that she was crying at the time, she said that she wanted to do something about her account; she didn't know exactly what to do to protect herself from invasion of the account on the part of her children, that Marvin had left for Europe, that he was going to be gone for a considerable length of time, and he wasn't going to write her because she had asked him—— he had asked her to sell her securities and to place the funds in a Swiss numbered account, and she didn't want to do it; she didn't know what to do about it, and she asked me how she could avoid that and put the funds beyond her getting to them."

tell her what a trust did.'' They made an appointment for May 14.

On that date Mr. Proctor and Mr. Powers, also a trust officer of the Bank discussed the proposed trust with Mrs. Walton at her home in Atherton. The plaintiff appeared normal and gave no evidence of being intoxicated. Both men discussed with her the difference between a revocable and irrevocable trust. Mr. Powers, who had brought specimen trust clauses, explained them to Mrs. Walton, including provisions for the payment of hospitalization and medical care. She indicated that her general idea was to place her assets beyond her own reach because that was the only way she could protect herself. In the course of the conversation, Proctor told plaintiff that the creation of a trust would give rise to a gift tax and using a small booklet of tax tables ''gave her a general idea of what the tax would be, on a $300,000 estate, 400 to $500,000 estate.'' According to Mr. Powers, Proctor told plaintiff that the trust was subject to gift tax and, after consulting the above-mentioned booklet, told her it would amount to about $75,000. Powers testified that plaintiff indicated she understood this. At the conclusion of the discussion, Mrs. Walton indicated that she wanted a trust drawn up along the lines suggested and directed the two men to contact Mr. Ira C. Lillick, her attorney for many years.

Six days later, on May 20, Mrs. Walton reentered Twin Pines Sanitarium. She was taken there by her daughter because, as the latter testified and the medical evidence confirms, she was so seriously inebriated that she could barely stand. Mrs. Moeckli on the following day advised plaintiff's attorney, Mr. Charles, of this development. She inquired of the latter what should be done about the trust and Mr. Charles suggested that, subject to the approval of Dr. James, Mrs. Moeckli should bring her mother home where the matter could be attended to in familiar surroundings. Mrs. Moeckli followed this up immediately and reported back to Mr. Charles that Dr. James believed it would be all right and had assured her that her mother was in a proper condition to execute the document. Evidence was introduced that during this stay at Twin Pines, plaintiff stated to Mrs. Dilla, a nurse at the sanitarium, that the Bank was drawing up a trust for her and that she was going to arrange her property so that it could not be touched by anyone, including herself.[7]

---

[7] Nurse Dilla, called by the defendants, testified: ''She was telling me that she had to go home, had some business with the bank and was

Mrs. Walton was discharged from Twin Pines on May 31. Dr. James testified that there was at that time no impairment of her thinking powers and that he thought "she was functioning at a reasonably good level for her." In his opinion, plaintiff during her stay at Twin Pines in May "had a very good understanding of her values, assets and needs to protect it, and fear of losing it. There was just no question about it." In answer to a series of questions by court and counsel relative to plaintiff's competency, Dr. James affirmed that with the exception of the period covered by the guardianship, he felt that Mrs. Walton while under his care understood the nature and extent of her estate, knew her relatives, displayed no lack of ability in managing her affairs, showed no evidence of any mental handicap "except this anxiety complex," and particularly from May 21 to June 1, 1959, was rational and mentally sound in all respects save such anxiety complex and except when she was grossly intoxicated.[8]

On June 1, 1959, the day after plaintiff's discharge from Twin Pines, Mr. Charles, her attorney, in the company of the Bank's trust officers Proctor and Powers drove to plaintiff's home in Atherton. Proctor had previously contacted Mr. Lillick and had discussed the clauses of the trust over the telephone with Mr. Charles. Mr. Charles drew the trust agreement.[9] While driving to plaintiff's home, the three men discussed the tax aspects of the trust. Mr. Charles, who had a general idea of Mrs. Walton's property, asked Mr. Proctor for the approximate value of the property to be included in the trust and was told that it would be between $400,000 and $500,000.

The group arrived at Mrs. Walton's home at 10 a.m. Mrs. Moeckli, who was there, was asked to leave the room. Mr.

drawing up this trust, and she said, 'I'm going to divide everything equally, no sense in one person having everything. I am going to have it so no one can get ahold of it, even myself, so no one can touch it.' "

[8]This portion of the examination of Dr. James was concluded with the following questions by the court: "THE COURT: All right, now, may I ask you since you seem to want to qualify it, was there any time while she was under your care with the possible exception of the time she was a subject of the guardianship proceedings, when she was unaware of the nature and extent of her property and assets, or the natural objects of her bounty? THE WITNESS: No. THE COURT: No qualification and no limitation of any kind? THE WITNESS: I think the only qualification, well, say, when she was drunk or grossly drunk. THE COURT: I am talking about here, the greater part of the time except for those isolated periods. THE WITNESS: Yes."

[9]The proposed agreement prepared by Mr. Charles was sent to Mr. Proctor for his examination and for the approval of the Bank's counsel.

Charles, in the presence of the two bank officers, then read the proposed trust agreement to Mrs. Walton, paragraph by paragraph, explaining each as he did so. Plaintiff had before her a copy of the instrument which she followed as he read, making comments from time to time. After the agreement had been read, they all adjourned to the dining room where Mrs. Walton signed it. Mr. Proctor signed on behalf of the Bank. (R. L. Shearn, vice-president of the Bank signed it on the same day after the group returned to San Francisco.) Mrs. Moeckli was then called in and the agreement, at plaintiff's request, was explained to the daughter. Since it was necessary to have plaintiff sign a deed conveying her residence to the trustee, the parties telephoned a notary, Mr. Moore, to take the acknowledgment of her signature. While they waited for him, the parties exchanged pleasantries and walked in the garden. Mr. Moore arrived, Mrs. Walton signed the deed, and the notary took the acknowledgment of her signature.

Mr. Charles, Mr. Proctor and Mr. Moore, the notary, all testified that there was nothing in plaintiff's manner, appearance or speech to indicate that plaintiff was under the influence of alcohol or drugs. They detected no odor of alcohol on her. Mr. Charles stated that, although Mrs. Walton was normally a nervous person, she did not on this occasion appear to be harassed or upset, had no difficulty following him, responded in a normal conversational manner, and generally appeared to comprehend what she was doing. Plaintiff told her attorney that she was happy with the matter being handled by the Bank and also relieved because she was free of the pressure upon her for making gifts. Mr. Moore, who on a previous occasion had seen plaintiff obviously under the influence of alcohol, stated that on June 1 she was an ''[e]ntirely different woman; perfectly normal.''

The foregoing testimony was in flat contradiction to plaintiff's claim that on the above occasion she was under the influence of alcohol and tranquilizing drugs and to her testimony at the trial that on the morning of June 1 before the trust was signed she took four (Milltown) tranquilizer pills and ''an inch or an inch and a half'' of whiskey out of a bottle.

Dr. James, from whom plaintiff had received the four Equanil tablets when she left Twin Pines on May 31, testified that even if she had taken the four tablets and the quantity of whiskey as she had testified, it would only have had a

sedative effect. Dr. Heersema, in answer to lengthy hypothetical questions, testified that with a person of Mrs. Walton's background, although the dosage of Equanil was heavy, it would not in itself be disorienting and if the drugs and the alcohol had any effect, it would show up prominently in the patient's actions.

On June 1, after Mr. Charles and the two Bank officers left plaintiff's residence, Mrs. Moeckli drove her mother back to Twin Pines where she was readmitted. She remained there continuously until January 25, 1960. During this time she discussed the subject of the trust with Mrs. Dilla, the nurse, on several occasions, remarking that she "[s]hould have done it years ago and had this worry off my mind" and that not even she could touch the property. In these conversations she indicated that her son would not be happy over what she had done.

On November 28, 1959, Marvin Walton returned from Europe. He had no contact with plaintiff until January 24, 1960, when he saw her at Twin Pines. On January 25, 1960, Mrs. Walton was discharged from Twin Pines. On March 17, 1960, plaintiff gave to all the defendants notice of rescission of the trust agreement and deed "upon the grounds of duress, undue influence, mistake, mental incapacity, and violation of fiduciary relationship." On April 8, 1960, she commenced the instant action to have such agreement and deed declared rescinded and cancelled, the assets of the trust restored to her and for an accounting. Generally speaking all defendants except Marvin Walton denied the material allegations of plaintiff's complaint.[10] Defendants Bank and Privact & Co. alleged that plaintiff's efforts to rescind the agreement resulted from the undue influence, control and duress of the son. Significantly, defendant Marvin Walton in his answer alleged and admitted on information and belief that all of the allegations of the complaint were true and prayed that judgment be entered for the plaintiff.

---

[10]Plaintiff's complaint alleged *inter alia* that at the time she signed both instruments she was under the influence of alcohol and tranquilizing drugs; that her mental faculties were impaired by an existing psychoneurotic mental condition and by her impaired physical condition; that the Bank, being under a fiduciary duty to fully advise her, had failed to advise her of the gift tax consequences of any transfer in trust; that she was unaware of any gift tax liability and by reason of the Bank's failure to so advise her, was faced with financial hardship in satisfying it; and that Mrs. Moeckli exercised undue influence and duress upon her in a specified manner so as to cause her to execute the trust agreement and deed.

The court found that plaintiff entered into the trust agreement on June 1, 1959; that at the time she did so she was "physically and mentally competent" to make and enter into the agreement and then "knew and understood what she was doing"; that at that time "she was not under influence of alcohol, tranquilizers, a psycho-neurotic condition, or any combination thereof"; that she did not enter into the agreement "as a result of any misapprehension of fact or law by plaintiff" and "was not acting under any misapprehension or mistake of fact as to the meaning of the Trust Agreement, its irrevocability, or the gift tax liability thereunder"; that when she entered into the agreement, she "was not acting under undue influence or duress on the part of defendant Alice Clare Moeckli" and that "[t]here was no breach of fiduciary duty to plaintiff" by the Bank or Mr. Charles. The court concluded that the trust agreement was valid and binding upon plaintiff and upon defendants, that plaintiff was not entitled to rescind it and rendered judgment accordingly.

I. The Appeal From the Judgment

Plaintiff's sole contention is that there is a lack of substantial evidence to support the findings. However she directs this attack only against those findings relating to the issues of competency and capacity and of mistake. We are presented with no argument on the findings bearing upon the alleged undue influence of plaintiff's daughter.[11]

Plaintiff professes to recognize the cardinal rule which governs our review in such instances. Out of sheer necessity we restate it: "When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact." (*Primm* v. *Primm* (1956) 46 Cal.2d 690, 693 [299 P.2d 231]; *Estate of Arstein* (1961) 56 Cal.2d 239, 240 [14 Cal.Rptr. 809, 364 P.2d 33]; *Estate of Bristol* (1943) 23 Cal.2d 221, 223 [143 P.2d 689]; *Crawford* v. *Southern Pac. Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) As plaintiff insists, as this rooted rubric ordains, and as we dutifully observe, the critical word in the canon is "substantial."

[11]The pretrial conference order designated three issues: "(1) Was plaintiff competent to make the trust at the time she signed it? (2) Was the plaintiff acting under such mistake as would invalidate the trust? (3) Was plaintiff acting under undue influence or duress of her daughter?"

(*Estate of Bristol, supra.*) It is settled, as plaintiff's cited cases make clear (see *Fewel & Dawes, Inc.* v. *Pratt* (1941) 17 Cal.2d 85, 89 [109 P.2d 650] ; *Estate of Gutierrez* (1961) 189 Cal.App.2d 165, 174 [11 Cal.Rptr. 51] ; *Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54] ) that substantial evidence means that which has probative force on the issues and is of ponderable legal significance. On these principles plaintiff takes the declared position that there is a total lack of any substantial evidence.

█ However, plaintiff seeks to elude the applicable rules. To say that we cannot reweigh the evidence, so she argues, "is to vastly over-simplify the role of an Appellate Court" and consequently "there must of necessity be a re-examination of the evidence." On oral argument, plaintiff's counsel, when confronted with certain substantial evidence supportive of the findings, maintained that it must be considered "in the light of the whole record." Although she protests to the contrary, plaintiff appears to us to suggest in an oblique way that we evaluate what we find in the record. As the court stated in *Estate of Teel* (1944) 25 Cal.2d 520, 527 [154 P.2d 384] : "Of course, all of the evidence must be examined, but it is not weighed. All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed." As Witkin puts it (3 Witkin, Cal. Procedure, p. 2250) : "The test . . . is not whether there is substantial conflict, but rather whether there is *substantial evidence in favor of the respondent*. If this 'substantial' evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment will be affirmed." █ An appellant cannot avoid and indeed will do violence to these precepts by reciting only the evidence favorable to him. (*Gold* v. *Maxwell* (1959) 176 Cal.App.2d 213, 217 [1 Cal.Rptr. 226].) "The appellate court starts with the presumption that the evidence sustains each finding of fact [citations], and the burden rests upon appellant 'to demonstrate that there is no substantial evidence to support the challenged findings.' [Citations.] To this end appellant must set forth in his brief all material evidence upon the point, not merely his own proofs [citations] ; . . ." (*Davis* v. *Lucas* (1960) 180 Cal.App.2d 407, 409 [4 Cal. Rptr. 479].) To put it plainly, this appellant must show that there is no substantial supporting evidence *at all* in this

record. After searching the record, viewing the evidence therein according to the established rules, and indulging in all reasonable inferences arising from what we have found (see *Berniker* v. *Berniker* (1947) 30 Cal.2d 439, 444 [182 P.2d 557]), we cannot hold that any of the findings under attack are unsupported.

1. *Trustor's competency and capacity.*

██ A person lacking capacity to make an ordinary transfer of property has no capacity to create an *inter vivos* trust. (Rest. 2d Trusts, §§ 19, 333 (see com. *f*, p. 151) ; 3 Scott on Trusts (2d ed.) § 333.2, p. 2425; Bogert on Trusts (2d ed.) § 997, p. 450 et seq.) ██ Incapacity, as in the case of contracts generally, may arise from intoxication of such a degree as to deprive a person of reason and understanding. (*Guidici* v. *Guidici* (1935) 2 Cal.2d 497, 502 [41 P.2d 932].) ██ In *Stratton* v. *Grant* (1956) 139 Cal.App.2d 814, 817 [294 P.2d 500], the court formulated the following rule: "It has been established that in order to have relief under . . . [Civ. Code, § 39] it is not necessary that one be incompetent to enter into any kind of contract or to transact any business. Rather the test is whether or not the party was mentally competent to deal with the subject before him with a full understanding of his rights. ██ Such a question is to be determined by the court or jury and if there is found in the evidence any rational ground supporting its determination its conclusion on this point will be upheld. (*Pomeroy* v. *Collins,* 198 Cal. 46, 69 [243 P. 657] ; *Carr* v. *Sacramento Clay Products Co.,* 35 Cal.App. 439 [170 P. 446].)'' (See also *Philbrook* v. *Howard* (1958) 157 Cal.App.2d 210, 214 [320 P.2d 609] ; *Peterson* v. *Ellebrecht* (1962) 205 Cal.App.2d 718, 721 [23 Cal.Rptr. 349].) The determination of the trier of fact that a person was competent to enter into a contract made upon substantial evidence is therefore binding on appeal. (*Philbrook* v. *Howard, supra;* *Estate of Miller* (1956) 143 Cal.App.2d 544, 549-550 [299 P.2d 1005] ; *Wilson* v. *Sampson* (1949) 91 Cal.App.2d 453, 458-460 [205 P.2d 753].)

██ In the instant case, the evidence summarized by us above is supportive of the trial court's findings that Mrs. Walton knew and understood what she was doing when she signed the trust agreement and that she was physically and mentally competent to enter into the agreement. After a telephone conversation with Mr. Proctor on the subject, plaintiff had a discussion with Mr. Proctor and Mr. Powers about the

trust at her home on May 14. The evidence shows that the nature and effect of the trust were explained to her; tentative trust terms were reviewed; that she appeared normal and not under any incapacity; and that she expressed a desire to have such a trust drawn up by her attorney. Before she signed the trust agreement on June 1, she followed attentively her attorney's careful explanation of the document and according to everyone present showed an understanding of the purpose and provisions of the agreement. She indicated to her attorney that she was pleased and satisfied with the decision she had made. She made a similar remark to her nurse after she returned to Twin Pines.

The evidence also shows that plaintiff's act of entering into the contract was not vitiated either by general underlying incapacity or by a particular condition brought on by her as she claimed on the morning the agreement was signed. There is substantial medical evidence that, despite the number of unfortunate episodes brought on by her condition of anxiety, Mrs. Walton, except when she was under the influence of intoxicants to a high degree, was rational and competent and had an understanding of her family and business affairs. This was in substance the testimony of Dr. Heersema, Dr. Stone and Dr. James. Her claim and testimony that at the critical time of signing the trust she was under the influence of alcohol and drugs was rejected by the trier of fact. All witnesses then present testified that she appeared normal, happy and sober and gave no indication by appearance, action or speech of being under such influence. According to the medical testimony, if she had taken the whiskey and Equinal as she claimed, the effect would have been obvious in her actions.

Contrary to plaintiff's claim we find nothing so inherently unsubstantial about the foregoing evidence as to lead us to believe that it generates only a conflict of words or so inherently incredible that we must regard it as unreasonable and valueless. Indeed, in our view, it is convincing and has probative force on the issue. (*Estate of Teed, supra,* 112 Cal.App.2d 638, 644.)

2. *Trustor's mistake.*

As we have pointed out (see footnote 11, *ante*) one of the issues in the case was whether the plaintiff was "acting under such mistake as would invalidate the trust."

The law is clear that where no consideration is received by the trustor for the creation of an *inter vivos* trust,

it can be rescinded or reformed for mistake to the same extent that an outright gift can be rescinded or reformed. (Rest. 2d Trusts, § 333, see com. *a*; 3 Scott on Trusts (2d ed.) § 333, p. 2424; § 333.4, pp. 2427-2428; see 59 A.L.R.2d 1229.) As Scott, *op. cit.*, states: "[W]here the settlor receives no consideration for the creation of the trust, as is usually the case, a unilateral mistake is ordinarily a sufficient ground for rescission, as it is in the case of an outright gift. It is immaterial that the beneficiaries of the trust did not induce the mistake or know of it or share it. It is immaterial whether the mistake was a mistake of fact or a mistake of law. The mistake may be such as to justify reformation rather than rescission of the trust." (Pp. 2427-2428.) ▮ Generally speaking, there is a mistake of fact when a person understands the facts to be other than they are. (*Reid* v. *Landon* (1958) 166 Cal.App.2d 476, 483 [333 P.2d 432]; *Baratti* v. *Baratti* (1952) 109 Cal.App.2d 917, 921 [242 P.2d 22]; *People* v. *Kelly* (1939) 35 Cal.App.2d 571, 574 [96 P.2d 372].)

▮ The determination of whether in a particular case one has acted under a mistake is for the trial court whose finding thereon, if supported by substantial evidence, will be conclusive on appeal. (*Reid* v. *Landon, supra,* pp. 483-484; *Nelson* v. *Meadville* (1937) 19 Cal.App.2d 68, 71-72 [64 P.2d 1116].)

*a. Mistake as to irrevocability of trust.*

▮ The evidence in the record shows that Mrs. Walton had no misunderstanding about the irrevocability of the trust. This was first mentioned to her by Mr. Proctor in his telephone conversation on May 8 or 11. This feature was then explained to her on May 14 at her home and carefully reviewed by her attorney when the trust was signed. She herself had indicated that she wanted her property put beyond her reach for her own protection. Before June 1, she told Mrs. Dilla, her nurse, that she was having a trust drawn up so that no one, including herself, could touch her property. After the signing of the agreement she told Mr. Charles, her attorney, that she was happy with the arrangement because she was free from the pressure of making gifts. After she returned to Twin Pines, she again mentioned the trust to Mrs. Dilla, remarking that she had the worry off her mind and that not even she, herself, could touch the property.

*b. Mistake as to gift tax liability.*

▮ The trial court found that at the time the plaintiff

544

entered into the trust agreement she was not acting under any misapprehension or mistake of fact "as to . . . the gift tax liability thereunder." This finding is supported by the testimony of both Mr. Proctor and Mr. Powers establishing plaintiff's knowledge of such tax liability. Both men stated that when they met with plaintiff at her home on May 14 she was told that the trust was subject to a gift tax liability, Proctor indicating that it would amount to approximately $75,000. Powers testified that plaintiff indicated that she understood this. Mrs. Walton denied that this occurred and testified that the first time she heard that the trust involved gift taxes was in January or February 1960 when she consulted with her present counsel. This merely created a conflict in the evidence which was resolved by the trial court. The court, as it was entitled to, rejected plaintiff's testimony and accepted that of the Bank officials.

 In the course of giving the above testimony, plaintiff, under examination of her own counsel, also stated that no one mentioned anything about gift taxes to her at the meeting on June 1 when she signed the agreement. She was then asked the following question: "Would you have signed the trust agreement that you did sign on June 1st, 1959 if you had known that you would have to pay gift tax because you signed it?" Defendant's objection thereto was sustained. Plaintiff's counsel then made an offer of proof to the effect that plaintiff would have answered that she would *not* have signed the agreement. It is now claimed that the court erred in sustaining the above objection. We think this claim has merit. It was the general purpose of the question to establish plaintiff's state of mind at the time the trust document was executed, plaintiff's theory being, among other things, that she did not think she was making an irrevocable gift in trust or one involving the payment of taxes, and did not intend to make such a gift. "The state of mind of a person, like the state or condition of the body, is a fact to be proved like any other fact when it is relevant to an issue in the case, and the person himself may testify directly thereto. [Citation.] Whenever the motive or intent with which an act was done is relevant, direct testimony is admissible, although not conclusive. [Citations.]" (*Cope* v. *Davison* (1947) 30 Cal.2d 193, 200 [180 P.2d 873, 171 A.L.R. 667]; *Fischer* v. *Ostby* (1954) 127 Cal.App.2d 528, 530 [274 P.2d 221]; *Shelby* v. *Hagood* (1960) 182 Cal.App.2d 760, 764 [6

Cal.Rptr. 422].)[12] ■ However, plaintiff's answer would have merely created an additional minor conflict in the evidence. As we have pointed out, there was substantial evidence that she was informed of the nature and effect of the transfer in trust, that she was making an irrevocable transfer of her assets and that this would be subject to a gift tax. In the light of all this evidence, the error was not prejudicial.

■ Plaintiff has presented a lengthy argument emphasizing the discrepancy in the amount of the tax. While Mr. Proctor told plaintiff on May 14 that the gift tax would be approximately $75,000, it subsequently developed that plaintiff's tax liability based upon the appreciated value of her assets, though not actually determined, would probably amount to approximately $92,500. The gist of plaintiff's argument seems to be that this establishes a mistake affecting the validity of the trust. At the outset we observe that at the trial plaintiff claimed that she acted under mistake *not* because she had been *misinformed* as to the tax liability to the extent of $17,500 (the difference between the above figures) but because she had *not* been *informed* of the tax liability *at all*.

Nevertheless since we accept the evidence favorable to the respondents that Mrs. Walton was told about the tax liability, we consider whether the above discrepancy in the amount of the tax constitutes a mistake of fact upon which plaintiff can rely. In our opinion it does not. As we view the evidence, plaintiff was told about the nature and effect of the trust and given an estimate of the gift tax liability. This was, as the circumstances indicate, nothing more than an estimate. At the conclusion of the meeting plaintiff decided to create the trust.

As the court said in *Reid* v. *Landon, supra,* 166 Cal.App. 2d 476, 483: ''Whether the mistake of fact here is one consisting of 'an unconscious ignorance or forgetfulness of a fact present' or a 'belief in the present existence of a thing which does not exist' (Civ. Code, § 1577), it must be one material to the contract. *The mistake must be such that it animated and controlled the conduct of the party; go to the essence of*

---

[12]Cf. *Shelby* v. *Hagood, supra,* for a question of similar format. In *Shelby* the issue was whether plaintiff was riding with defendant as a guest or passenger. Defendant was asked on direct examination if plaintiff had not given her money for the ride *would* she *have given* plaintiff a ride anyhow. The overruling of plaintiff's objection to the question was held not to be error on the authority of *Cope* v. *Davison, supra.*

*the object in view and not be merely incidental.* The court must be satisfied that but for the mistake the complainant would not have assumed the obligation from which he seeks to be relieved [citation]." (Italics added.) Plaintiff was motivated to create the trust not for tax purposes but to free herself from the demands of her children. There is nothing in the evidence leading to the conclusion that plaintiff's decision to create the trust was predicated on a definite commitment to her and understanding by her that the tax liability would not exceed the $75,000 estimate. Her main object was to place all her assets in trust so that, as she stated, no one could touch them. She did not create the trust for tax purposes. It is apparent from the record that the estimated tax liability was something incidental to her main purpose and did not, to quote *Reid,* "go to the essence of the object in view. . . ."

Plaintiff relies on the following cases dealing with the effect of a mistake as to the tax consequences of the creation of a trust: *Stone* v. *Stone* (1947) 319 Mich. 194 [29 N.W.2d 271]; *Miller* v. *National Bank of Detroit* (1949) 325 Mich. 395 [38 N.W.2d 863]; *Irish* v. *Irish* (1949) 361 Pa. 410 [65 A.2d 345]; *Hardy* v. *Bankers Trust Co.* (1945) 137 N.J. Eq. 352 [44 A.2d 839].[13] She argues that in the above cases rescission or reformation of the trust was permitted because the mistake as to tax liability was material. We note that three of the cases, *Miller, Irish* and *Hardy,* involve the *modification* or *reformation* of the particular trust, a matter not here in issue. Moreover, in *Miller, supra,* the sole purpose of the trust was to minimize taxes and reformation was allowed because the trustors were mistaken as to their rights to do so. In *Irish,* reformation was permitted to include a provision essential to certain tax laws which had been intended but omitted by inadvertence or mistake; in *Hardy, supra,* modification was permitted to meet an unforeseen change in a tax law. Although the opinions in the last two cases do not expressly so state, there is an indication that the trusts there involved were established for tax reasons or that taxes were a substantial consideration in their creation. In the *Stone* case, *supra,* the court allowed rescission of a trust created solely for tax purposes where its creation was induced by mistake of law. (Cf. *Miller, supra.*) On the other hand,

---

[13]These cases are discussed in 3 Scott on Trusts (2d ed.) § 333.4, pp. 2428-2429.

as Scott points out (3 Scott on Trusts, pp. 2428-2429) in *Lowry* v. *Kavanagh, Collector* (1948) 322 Mich. 532 [34 N.W.2d 60], *rescission* of a gift of corporate stock was denied by the court where it appeared that the principal purpose in making the gift was not to minimize taxes.

In our view, the foregoing authorities are consistent with the rationale of *Reid* v. *Landon, supra,* 166 Cal.App.2d 476. Where the trust is created solely or principally for a tax purpose, the mistake as to the tax consequence is a material one. In the instant case, however, there is no evidence that the trust was created to minimize taxes (cf. *Stone, supra; Miller, supra*) or that it was motivated by a tax purpose. We are therefore not persuaded that in the light of the evidence plaintiff created the trust on the rigid basis of a $75,000 gift tax liability and that she would not have done so if she had been informed of a liability of $92,500.

## II. THE APPEAL FROM THE ORDER DENYING MOTION TO TAX COSTS

On February 16, 1962, defendants filed their memorandum of costs and disbursements. On February 20, 1962, plaintiff filed her motion to tax costs by striking from said defendants' memorandum the following item of costs: "Original and 1 copy of daily transcript of trial proceedings . . . . $2,485.87." The court denied the motion.[14]

Government Code section 69953 provides in relevant part as follows: "In civil cases the fees for reporting and for all other transcriptions *ordered by the court* to be made shall be paid by the parties in equal proportion, and either party at his option may pay the whole. In either case, all amounts so paid by the party to whom costs are awarded shall be taxed as costs in the case. The fees for transcripts and copies ordered by the parties shall be paid by the party ordering them." (Italics added.)

The record before us, the completeness of which is not disputed by defendants, shows no order made by the trial judge for either an original or any copy of the daily transcript.[15] Defendants conceded at oral argument that there was no such order.

Under the above statute, the fees of the court reporter for

---

[14]Plaintiff's motion challenged two items. The above item is the only one complained of on appeal.

[15]At oral argument the parties advised us that plaintiff ordered one copy and defendants two copies of the transcript.

the preparation of a daily transcript, used for the trial, are not a proper item of costs unless such transcript has been expressly ordered by the court. (*Barkly* v. *Copeland* (1890) 86 Cal. 493, 494 [25 P. 3]; *Sunny Slope Water Co.* v. *City of Pasadena* (1934) 1 Cal.2d 87, 99-100 [33 P.2d 672]; *Peoples Ditch Co.* v. *Foothill Irr. Dist.* (1932) 123 Cal.App. 257, 260 [11 P.2d 86]; *Estate of Tamagno* (1934) 139 Cal. App. 69, 74-75 [33 P.2d 38]; 3 Witkin, Cal. Procedure, p. 1911.)

Since there was no order of court requiring the preparation of the transcript, the denial of plaintiff's motion as to such item was error.

The judgment is affirmed. The order denying plaintiff's motion to tax costs to the extent that it relates to the item of cost of the original and copy of the daily transcript in the sum of $2,485.87 is reversed with directions that the trial court tax the costs by disallowing said item in accordance with the views herein expressed. In all other respects the order appealed from is affirmed. The respondents are awarded costs on both appeals.

Bray, P. J., and Molinari, J., concurred.

A petition for a rehearing was denied August 13, 1963, and appellant's petition for a hearing by the Supreme Court was was denied September 18, 1963.