[Civ. No. 23072.   Second Dist., Div. One.   Dec. 23, 1958.]

HELEN REID et al., Appellants, v. WINIFRED ALICIA LANDON, Respondent.

Carleton B. Wood and Paul D. Kolyn for Appellants.

Cornwall & Westwick for Respondent.

LILLIE, J.—Plaintiffs filed an action for specific performance of an option agreement and, in the alternative, for damages for its breach. Defendant's answer set up a general denial and inadequacy of the consideration specified in the agreement and, in addition, alleged that the agreement had been rescinded for fraud and mistake. Plaintiffs appeal from the court's judgment in favor of defendant.

Viewing the evidence in the light most favorable to respondent, and indulging all intendments and reasonable inferences in favor of sustaining the findings (*Clark* v. *Redlich,* 147 Cal.App.2d 500 [205 P.2d 239]), the following is a brief summary of the pertinent facts surrounding the execution of the agreement.

Defendant owned a 15-acre ranch in Santa Ynez Valley, upon which she and one Miss Burt resided. As a gift, and for no consideration, defendant deeded one acre thereof to plaintiffs, close friends of hers, who lived and worked in the city. At defendant's invitation, plaintiffs decided to retire to defendant's ranch and open a tearoom. They moved into her home in 1946. Because of the intimate friendship existing among the four women, and defendant wanting them all to share equally with her in the ranch, in May, 1947, without receiving any monetary consideration therefor, she deeded the entire ranch to the four in joint tenancy. At this time plaintiffs relinquished their one acre. Shortly thereafter, plaintiffs constructed a tearoom, hereinafter called Orchard House, on a portion of the premises and opened it for business in the fall of 1947. Miss Burt died shortly thereafter and she is not involved in this litigation. Defendant had no interest in the tearoom and has never claimed any, but in order to help her friends finance it she contributed some of her own money, all of which has been repaid; and with her permission a mortgage was placed on the ranch. Although the ranch was held in joint tenancy, the tearoom was not a joint venture, but was constructed and operated entirely by the two plaintiffs.

In July, 1951, desiring to have in their names alone the land upon which Orchard House was located, plaintiffs proposed to defendant that she deed it to them in return for their deed to the remainder of the ranch. Since defendant at no time had or wanted any interest in Orchard House, she orally

agreed with them to exchange deeds. Defendant told them she would have her attorney attend to it. An informal accounting then resulted in the settlement of all accounts, including proration of taxes, insurance, and reimbursement of any money due her; and plaintiffs agreed to pay her $1,000. Thereafter, but during the same conversation, plaintiffs discussed with defendant the one acre lying between Orchard House and the highway.

A factual conflict arises here, but the trial court found, and there is ample evidence thereof in the record, that there was no mention between plaintiffs and defendant of either any option to buy the acre in question or any sale price therefor; and that defendant at no time ever wanted, or intended, to sell the same. The evidence further discloses that after the reciprocal deeds and informal accounting were each discussed and agreed upon plaintiffs then asked defendant if she would sell them the acre between Orchard House and the road. She said she would not and furthermore, it had been leased for five years. Plaintiffs then asked her if they could have the right of first refusal thereon, stating that in return therefor they would give her the right of first refusal on Orchard House. Defendant told them she was not interested in a first refusal right on Orchard House for had she any interest in it she would not have agreed to deed it to them in the first place. She further advised them that she did not want or intend to sell the acre in question. Finally, to keep harmony she agreed to give them a right of first refusal in the event she ever decided to sell. Defendant testified that she at no time agreed to give plaintiffs an option to buy and that the word "option" was never mentioned, nor was the subject of an "option" ever discussed.

Several days thereafter, defendant went alone to her attorney and discussed the various informal agreements, including the proposed reciprocal rights of first refusal, and accordingly asked him to draw the papers. After she left his office, he prepared certain deeds and documents, including a letter agreement which gave plaintiffs a right of first refusal on the acre and defendant a right of first refusal on Orchard House. None of these instruments made any mention of an option to buy.

Thereafter, and without the knowledge of defendant, plaintiffs went to see defendant's attorney who read to them the letter agreement which he had prepared at the request of de-

fendant; and gave them the ranch quitclaim deed to sign. Plaintiffs thereupon told him the letter agreement was in error, that defendant had agreed that they were to have an option to buy the acre instead of only the right of first refusal. Relying on plaintiffs' word, defendant's counsel, without further advising her or consulting with defendant, and without her knowledge, drew a new letter agreement, giving plaintiffs an option to purchase the acre for $200, and defendant a right of first refusal on Orchard House. He mailed the executed quitclaim deed, the grant deed to Orchard House to be signed by defendant, the new option letter agreement and a letter of instruction, not to defendant his client, but to plaintiffs, who first took the documents to their own lawyer for advice and then presented them to defendant for her signature. Defendant had not seen or heard from her counsel since she asked him to prepare the documents and she did not know of the change in the letter agreement; nor did plaintiffs advise her they had been to see her counsel, that they had requested him to change the terms of the letter agreement as opposed to those she asked her lawyer to prepare, that he had done so, or that the document was any different than the one she had originally authorized him to draw. In presenting the letter agreement and other documents to her for her signature, plaintiffs told defendant they were the papers drawn by her lawyer to put their agreement in formal form, and that they all should sign them. Defendant read the documents, including the letter agreement. She saw the word "option" but believed the term to mean the same as a "right of first refusal" upon which they had originally agreed, which she discussed with her counsel and concerning which she asked him to prepare the letter agreement. Since she had not previously discussed any option with plaintiffs, she did not understand the word "option" to mean an option to buy, as explained to her later, or that there was any distinction between that term and the refusal right. She thought she was signing an agreement giving plaintiffs only a right of first refusal.

Relying upon plaintiffs' representations and believing it to be the same document she had instructed her attorney to prepare, she executed the letter agreement, having "utter faith" in her friends and her lawyer. She also signed the grant deed and letter of instruction to her counsel, which incidentally referred to the letter agreement as containing "certain first refusal rights" without any mention of an option. Thereafter, the parties continued to live together for five years

during which time no mention was made of any option. However, on August 7, 1956, plaintiffs wrote to defendant advising her they were taking up the option to buy under the letter agreement. This was defendant's first knowledge that the letter agreement actually contained an option to buy, as such. A controversy arose and plaintiffs moved out of defendant's home. Defendant refused to convey the acre and on September 27, 1956, served a notice of rescission of the agreement on plaintiffs.

The trial court found against the material allegations of plaintiffs' complaint and specifically found that the price of $200 for the acre in question was neither reasonable nor adequate consideration therefor, and that the alleged option agreement was neither just nor fair to defendant. Plaintiffs offered no evidence on the issue of damages and the court found they had sustained none. Appellants attack none of these findings. As to the affirmative defenses set up in the answer, the trial court found that plaintiffs' statements to defendant's lawyer that they were to have an option to purchase the acre for $200 were false, although not knowingly and deliberately so; that defendant relied upon the statements in signing the letter agreement and would not otherwise have signed it; and that at all times defendant mistakenly believed she was executing only a right of first refusal. The trial court concluded that the agreement was not fair or equitable to defendant and the consideration for the property was inadequate; that defendant signed the agreement while laboring under a mistake of law and fact; that plaintiffs were not entitled to specific performance thereof or damages; that plaintiff had no right, title or interest in the one acre and defendant had rescinded the agreement on September 27, 1956, on the ground of mistake.

Although plaintiffs have appealed from the entire judgment, they seek to reverse only that portion of the judgment resulting from the trial court's findings and conclusions arising out of the affirmative defenses set up in defendant's answer. They attack only that portion of the judgment declaring the rescission of the option letter agreement and that plaintiffs have no interest, right or title in and to the acre in question. They do not question any other findings or conclusions of the trial court.

Appellants contend the trial court erred in adjudicating the rescission of the option letter agreement because it was

not rescindible, and in permitting partial rescission since the agreement was indivisible.

Section 3406, Civil Code, permits the trial court to adjudicate the rescission of a written contract in certain cases mentioned in section 1689, Civil Code, which entitled a party to rescind if his consent was given by "mistake." Appellants' first contention is predicated on the argument that the evidence discloses no "mistake of fact" which would relieve defendant from the terms of the agreement.

It is true that under section 1577, Civil Code, defining "mistake of fact," not any and every mistake is remediable. Of whatever it might consist, the mistake of fact claimed under this section must not have been caused by the neglect of a legal duty on the part of the claimant. In determining what conduct will amount to a neglect of duty the courts recognize there is an element of carelessness in nearly every case of mistake (*Van Meter* v. *Bent Const. Co.*, 46 Cal.2d 588 [297 P.2d 644]) and that which does not amount to the neglect of a legal duty will not of itself bar rescission where the mistake does not stem from an original error in judgment. (*Brunzell Constr. Co.* v. *G. J. Weisbrod, Inc.*, 134 Cal.App.2d 278 [285 P.2d 989]; *M. F. Kemper Constr. Co.* v. *City of Los Angeles*, 37 Cal.2d 696 [235 P.2d 7]; *Klose* v. *Sequoia Union High School Dist.*, 118 Cal.App.2d 636 [258 P.2d 515].) This rule is particularly applicable in a situation in which false representations were made to induce the execution of the instrument, even though the person making them believed them to be true. The Supreme Court so held in *Van Meter* v. *Bent Constr. Co.*, 46 Cal.2d 588, stating at page 595 [297 P.2d 644] : "There is even more reason for not barring a plaintiff from equitable relief where his negligence is due in part to his reliance in good faith upon the false representations of a defendant, although the statements were not made with intent to deceive. . . . A defendant who misrepresents the facts and induces the plaintiff to rely on his statements should not be heard in an equitable action to assert that the reliance was negligent unless plaintiff's conduct, in the light of his intelligence and information, is preposterous or irrational."

In support of their argument that no mistake of fact existed, appellants place great reliance on defendant's testimony that before signing it she read the letter agreement and observed the word "option." They urge that since the term is unambiguous, defendant is presumed to have known its meaning. However, included in her testimony is her statement that al-

though she now knows the meaning of the word "option," she did not then understand it and thought it had the same meaning as a right of first refusal. ■ Although generally one is presumed to know the meaning of unambiguous language and will be bound by the execution of a written instrument including it, the rule applies only in the absence of fraud, confidential relationship or circumstances indicating excusable mistake. (*Fraters G. & P. Co.* v. *Southwestern C. Co.*, 107 Cal. App. 1 [290 P. 45]; *Wetzstein* v. *Thomasson*, 34 Cal.App.2d 554 [93 P.2d 1028].)

■ Whether the mistake of fact here is one consisting of "an unconscious ignorance or forgetfulness of a fact present" or a "belief in the present existence of a thing which does not exist" (Civ. Code, § 1577), it must be one material to the contract. The mistake must be such that it animated and controlled the conduct of the party; go to the essence of the object in view and not be merely incidental. ■ The court must be satisfied that but for the mistake the complainant would not have assumed the obligation from which he seeks to be relieved (*Roller* v. *California Pacific Title Ins. Co.*, 92 Cal. App.2d 149 [206 P.2d 694]). In *Foster* v. *De Venney*, 107 Cal. App. 500 [290 P. 462], the vendor, in a contract of sale, as vendee well knew, was an elderly woman with defective eyesight who relied upon the advice of a third party in business affairs and signed the contract in the mistaken belief it had her advisor's approval. The court found the mistake to be material to the contract and said, at page 504: ". . . when she signed she believed that the person upon whom she was relying knew the terms of the contract and approved them. Her mistake, therefore, was one material to the contract."

■ Generally a mistake of fact occurs when a person understands the facts to be other than they are (*People* v. *Kelly*, 35 Cal.App.2d 571 [96 P.2d 372], citing *O'Brien* v. *Selskab*, 94 N.J.L. 244, 246 [109 A. 517]; 40 C.J. 1227). An example is found in *Nelson* v. *Meadville*, 19 Cal.App.2d 68, at page 70 [64 P.2d 1116]; "If the court was satisfied from all the evidence at the trial that notwithstanding such examination and reading, the plaintiff did not then understand the terms of the instrument and was not aware that they provided for the 25 years' instead of six months' option, it was authorized to find that the agreements were accepted by plaintiff under a mistake in this particular. (*Sullivan* v. *Moorhead*, 99 Cal. 157, 160 [33 P. 796].)"

■ To determine whether a mistake of fact existed, we

must accept as conclusive any decision of the trial court in a factual conflict if there is sufficient evidence in the record to support it. A mere conflict in the testimony as to the mistake does not necessitate a denial of relief. (*Nelson* v. *Meadville*, 19 Cal.App.2d 68 [64 P.2d 1116] ; *Hutchinson* v. *Ainsworth*, 73 Cal. 452 [15 P. 82, 2 Am.St.Rep. 823] ; *Sullivan* v. *Moorhead*, 99 Cal. 157 [33 P. 796].) ██ The record before us fully justified the finding of the trial court on the issue of mistake of fact. The testimony of the defendant contained evidence of sufficient substantiality to warrant an adjudication of rescission. We have before us a situation in which plaintiffs, unknown to defendant, had greater knowledge concerning the preparation and the terms of the agreement than she; a circumstance of intimate friendship bordering on a confidential relationship existing between defendant and plaintiffs, trust in plaintiffs, and defendant's reliance upon their false representations. Although the trial court found no fraud to exist, there was clearly an imposition by plaintiffs upon their friend. Had defendant known the agreement was not the same she had instructed her counsel to prepare and its terms were not in accord with her original agreement, she would not have signed it. The $200 consideration was wholly unreasonable and inadequate, the reasonable market value of the acre in July, 1951, being $550 to $800, the enforcement of which would have been unconscionable. It is clear that defendant's mistake was due to conduct that constituted neither a neglect of duty or an error in judgment and was not "preposterous or irrational," but a natural and reasonable mistake due largely to defendant's reliance on the plaintiffs' representations that the document reflected the terms of her original agreement. Having been told by plaintiffs the letter agreement had been prepared by her counsel, he never having advised her of the change; believing plaintiffs' representations that the document embodied the terms originally agreed upon and not understanding the difference between an "option" and a "first right of refusal," defendant signed the option letter agreement in the mistaken belief that as a matter of fact she was signing quite another document. We conclude that the evidence justified relief from the terms of the agreement (Civ. Code, §§ 1577, 1689), and the court's adjudication of defendant's rescission thereof.

A determination of appellants' second contention that the transaction of the parties was single, entire and indivisible and that the option letter agreement, as a part thereof alone,

could not be rescinded depends mainly upon the interpretation of the contract and the intention of the parties. Appellants concede that if the option letter agreement is separable from the rest of the transaction, it could be rescinded without disturbing the reciprocal exchange of deeds and the accounting resulting in the payment to defendant of $1,000.

Whether a contract is susceptible of division depends on its terms, the language employed, the subject matter covered, the nature and purpose of the agreement, its relation to other documents in the transaction and the intention of the parties as reflected in its terms (*Simmons* v. *California Institute of Technology*, 34 Cal.2d 264 [209 P.2d 581]; *Herzog* v. *Purdy*, 119 Cal. 99 [51 P. 27]; *Sterling* v. *Gregory*, 149 Cal. 117 [85 P. 305]; *Conrad* v. *Thompson*, 137 Cal.App.2d 73 [290 P.2d 36]).

Substantial evidence in the record discloses that in July, 1951, plaintiffs were originally and primarily interested in obtaining in their names alone the land on which Orchard House was located, that they approached defendant for that purpose and artfully initiated the discussion that resulted in the agreement to execute reciprocal deeds. They proposed to defendant that if she would give them a deed to Orchard House they, in exchange, would deed to her the remainder of the ranch in which they wanted no interest. Although defendant had no particular desire to regain sole title to the ranch, or to retain an interest in Orchard House and was not interested in a right of first refusal on it, otherwise "she wouldn't have deeded it to appellants" in the first place, she was willing to exchange deeds. Thereafter, they discussed the proration of taxes and insurance and repayment of an amount due defendant on her loan, and after an informal accounting, plaintiffs agreed to a payment of $1,000 to make defendant whole. It was after these discussions and agreements the conversation concerning the acre in question took place. Defendant, having no interest in Orchard House, likewise had no interest in selling the acre between it and the highway, did not want or intend to sell it, so told plaintiffs, and had no concern about the subject. Finally, however, "(I)f it pleased them," she told plaintiffs she would agree to reciprocal rights of first refusal although she had no interest in Orchard House and "(I)t was because of them that this was written. They were insistent on it." It is obvious from her testimony that since she never intended to

sell the acre she could see no harm in giving them a right of first refusal, and since plaintiffs were insistent, it would keep the friends who lived with her happy. It is also clear that neither the "first right of refusal" on Orchard House nor the same on the acre in question was of any business concern to her and she agreed to them only to preserve harmony and that the reciprocal rights of first refusal at no time entered into their discussion concerning the exchange of deeds or other matters agreed upon, or had any connection with them. It was wholly incidental. That this agreement concerning the right of first refusal was not a part of, or connected with the other agreements, is clearly reflected in the conduct of defendant's counsel. He did not intend the exchange of deeds to be dependent on the letter agreement. Although the deeds themselves contained various agreements relating to water rights, easement for access, etc., and another agreement prorated taxes, removed the encumbrance on the ranch and provided for the $1,000 payment, defendant's counsel prepared the letter agreement on a paper apart from all the others and as the subject of a wholly separate document.

As to its context, the consideration for her "option" is expressly stated in the letter agreement to be defendant's first right of refusal on Orchard House. The document contains its own consideration and has no connection with the exchange of deeds which was reciprocal. It makes no mention of its dependency on or reference to any other document or transaction, and none of the others mention their dependence on the letter agreement. The letter agreement itself embodies the entire agreement between the parties concerning the "option" and first right of refusal, without reference to any accounting between the parties, proration of taxes and insurance, the payment of the $1,000, the release of the encumbrance or any other factor, by expressly providing therein that upon signature, it "shall constitute this letter a contract between us."

Although the deeds were recorded, the letter agreement was neither recorded nor acknowledged. On the record before us it can hardly be said that the deed exchange depended upon getting the "option" or that the exchange of deeds would not have been agreed to unless the option had been given. Plaintiffs were anxious to receive in their names alone a deed to Orchard House. This was their primary object. A later conversation concerning the acre between the house and the road could no more make the exchange of deeds dependent on the

"option" agreement than the fact that all the documents were signed at the same time. Furthermore, the deeds were exchanged forthwith, but the "option" could not be exercised until five years later. In addition, where the things to be done under a contract are to be done at different times, and the consideration is apportioned to each of the items to be performed, the contract may be severable. (*Blonder* v. *Gentile,* 149 Cal.App.2d 869 [309 P.2d 147] ; *Sterling* v. *Gregory,* 149 Cal. 117 [85 P. 305].) In the case before us, the consideration is apportioned and none of the documents expressly or even by inference show any interdependence. That such a contract is severable is borne out by the rules set forth in numerous authorities. (*Pacific Wharf etc. Co.* v. *Standard American Dredging Co.,* 184 Cal. 21 [192 P. 847] ; *In re Marshall's Garage,* 63 F.2d 759.)

Implicit in the court's finding that defendant rescinded the option letter agreement and adjudication of the rescission, is the finding that the letter agreement was separate from the other transactions. The trial court's interpretation of the meaning of an instrument cannot be disturbed on appeal when it appears to be reasonable and consistent with the intention of the parties (*Hayward Lbr. etc. Co.* v. *American Nat. Bank,* 50 Cal.App.2d 247 [123 P.2d 56]).

The record fully justifies the finding that what defendant rescinded was an agreement separate and apart from the other transactions, which could be and was rescinded. The parties were equitably returned to status quo. The rights of both parties in the agreement were cancelled—the option to buy on the one hand and the first right of refusal on the other, and they were left where they would have been had the agreement never been executed.

The judgment is affirmed.

White, P. J., and Fourt, J., concurred.