435 P.2d 829

Thelma REEVES, Administratrix of the Estate of M. L. Reeves, Deceased, dba Reeves Sand and Rock Company, Appellant,

v.

ARIZONA AGGREGATE ASSOCIATION HEALTH AND WELFARE FUND, by Elmer D. Clark, Donald E. Muir, Duane D. Bryan, Trustees, and Sand, Rock, Ready Mix, Concrete and Asphalt Plant Health and Welfare Fund of Arizona, Appellees.

No. 8232.

Supreme Court of Arizona,
In Banc.

Dec. 27, 1967.

Gibbons, Kinney & Tipton, by Jack C. Warner, Phoenix, for appellant.

Minné & Sorenson, by Richard Minné, and Shimmel, Hill, Kleindienst & Bishop, by Richard G. Kleindienst, Phoenix, for appellees.

UDALL, Justice:

Separate actions were originally commenced in the Maricopa County Superior Court by Arizona Aggregate Association Health and Welfare Fund, and its trustees, and by Sand, Rock, Ready Mix Concrete and Asphalt Plant Health and Welfare Fund of Arizona, and its trustees, hereinafter referred to as plaintiffs, against M. L. Reeves, dba Reeves Sand and Rock Company. Before trial of the two lawsuits, the cases were consolidated, and because of the death of M. L. Reeves, his wife Thelma Reeves, Administratrix, was substituted as party defendant. She and her deceased husband will be referred to jointly and interchangeably as defendant, except as it may be necessary to refer to either of them individually. After jury trial, verdicts were directed for plaintiffs in each case, and judgments were entered for a total amount of $16,542.00. Defendant appeals from these judgments and from orders denying her after-judgment motions to set aside the verdicts and for entry of judgments in her behalf, or alternatively, for a new trial.

The facts may be stated as follows: Prior to the year 1957, collective bargaining agreements were in force between employers of the sand, gravel and ready-mix concrete industry and the Teamsters and Operating Engineers unions. In 1957, members of the industry formed an employer association known as the Arizona Aggregate Association, an Arizona corporation. In 1959, it took upon itself the job of bargaining for its members new terms of employment. Contracts were ultimately drawn and signed by the unions on the one hand and the Aggregate Association, on behalf of its members, on the other.

Defendant owned and operated an unincorporated sand and rock business during the period in question. Collective bargaining agreements were in force between it and various unions from 1955 to 1959. When the Aggregate Association began negotiating terms for a new agreement for its members, it sought permission from defendant and other non-members of the Association to allow it to use their names in order to present to the unions the appearance of a "united front" by employers. Pursuant to the solicitations of the Association, Mr. Reeves signed the following letter:

"ARIZONA AGGREGATE
ASSOCIATION
April 17, 1959.

"Reeves Sand & Rock Co.

3000 West Broadway

Phoenix, Arizona

"Gentlemen:

"As you are aware, the International Union of Operating Engineers, Local No. 428; the Construction and Building Materials and Miscellaneous Drivers Local No. 83; the Chauffeurs, Teamsters, Warehousemen and Helpers, Local No. 310; and the Arizona District Council

Construction Production and Maintenance Laborers have notified the employers of our industry of their desire to negotiate a new contract.

"The Arizona Aggregate Association has undertaken the task of negotiating this contract in the best interest of our industry. We will endeavor to accomplish this goal with the aid of counsel.

"In order to present a united front, we ask that you allow the committee appointed by the Arizona Aggregate Association and/or person or persons appointed by this committee to represent your company in these negotiations. Please sign in the space provided if you wish to authorize this action and return one copy in the enclosed self-addressed envelope. *An answer by return mail is imperative!*

"The next Arizona Aggregate Association meeting is scheduled for Saturday, May 9, 1959. The committee plans to meet with the representatives of the unions prior to this date for the purpose of exchanging proposals.

"Sincerely,

"ARIZONA AGGREGATE ASSOCIATION

"Elmer D. Clark, President

"EDC:bam

"Accepted: /s/ M. L. Reeves (signature)

Owner (Title)

May 18, 1959 (date)"

It was adduced at trial that Mr. Reeves refused to sign the letter at first. It was only after he was assured that the letter would not bind his company to any terms ultimately reached and that it was only for negotiating purposes that he signed. Reeves Sand and Rock Company was thereupon included on a list of "member companies" made up by the Aggregate Association, which list was submitted to the unions with which they were negotiating.

Collective bargaining agreements were consummated on July 27, 1959 between the Aggregate Association and the unions.

Under the terms of the agreements it was provided that a health and welfare plan be established and that the Aggregate Association should administer the plan and receive payments as trustee. Included in Article XII of the contract were the following provisions:

"(b) Effective the date said committee shall agree upon (said date in no event to be prior to September 1) all Employers shall pay to the Arizona Aggregate Association not to exceed the 7½ cents per hour worked by each employee covered hereunder.

"(c) Said plan shall recognize and take into consideration that many individual Employers covered by this Agreement have had in effect a variety of Health and Welfare plans on both a participating and non-participating basis by employees and any such plan shall not eliminate any vested rights or values existing therein or prohibit a continuation of employee participation therein, so long as each Employer contributes approximately the said 7½ cents per hour."

Subsequently an Agreement and Declaration of Trust was executed which provided that a trust be created to administer the welfare plan, that the trust fund be entitled the Arizona Aggregate Association Health and Welfare Fund, and that the powers of the Aggregate Association as trustee be delegated to three members of the Association to administer the trust and fund. By the terms of the trust indenture, the three trustees were authorized by the Association *inter alia* to collect the 7½ cents per man-hour payments required by Article XII, and take action necessary to carry out the purposes of the trust.

In October 1960 the collective bargaining agreements were amended by the parties thereto to provide for a health and welfare fund which would be jointly administered by members of both management and union instead of just management as before. A corresponding Agreement and Declaration of Trust was executed creating the Sand, Rock, Ready Mix Concrete and Asphalt

Plant Health and Welfare Fund of Arizona. The amendment deleted Article XII (C), above quoted, which defendant claims authorized private welfare plans in lieu of the union plan, so long as at least 7½ cents per man-hour was spent for the private plan.

On December 8, 1960, separate actions were brought against Reeves by the Arizona Aggregate Association Health and Welfare Fund and by the Sand, Rock, Ready Mix Concrete Asphalt Plant Health and Welfare Fund of Arizona. It was alleged that defendant is a signatory to the collective bargaining agreements and amendments heretofore discussed; that he is obligated to make payments to the funds as provided in the agreements; and that to the date of the complaint has refused to make payments into either fund. The complaint prayed judgment against the defendant for 7½ cents per man-hour as provided for in the contract, together with a prayer for liquidated damages, attorneys fees, and costs as provided in the agreements. Defendant denied specifically that he was a signatory to the collective bargaining agreements and that it was not his intention that he be bound by any agreements entered into with the unions by the Aggregate Association.

The case was tried before the court sitting with a jury. At the conclusion of the testimony the plaintiff made a motion for a directed verdict in favor of plaintiff. The motion was granted and the jury was directed to bring in a verdict for the plaintiff. Damages were assessed and attorneys fees awarded. On July 9, 1963, the Court entered judgment in favor of the plaintiffs and against the defendant on both causes of action for the sums specified in the verdicts.

Of the numerous assignments of error set forth on this appeal, we will first consider defendant's contention that the trial court erred in directing verdicts for plaintiffs because reasonable minds could differ as to the conclusions to be drawn from the evidence on the issues in the case.

The gravamen of plaintiffs' complaint is defendant's alleged liability for payments to the health and welfare fund. We are satisfied that the evidence will not support a finding of liability on the basis of his being a signatory to the collective bargaining agreements. Under Article II of the agreement it is expressly provided that the Aggregate Association signature bound Association members only. The applicable portion reads:

"(d) It is understood and agreed that the ARIZONA AGGREGATE ASSOCIATION is a non-profit association and has negotiated the terms and conditions of this Agreement and has executed it on behalf of those of its members whose names appear on Appendix 'A' attached hereto and that only those members of the said ARIZONA AGGREGATE ASSOCIATION who, prior to the date hereof, have authorized the said association to act as its collective bargaining agent are bound by the terms hereof, or such additional members, after the execution hereof * * *."

Similarly, the trust agreements executed by the unions and Aggregate Association, as well as the contract amendments executed by the unions and Aggregate Association, as well as the contract amendments executed by these parties over a year later, expressly excluded defendant from being a party thereto in the absence of his personal signature. Article XI (B) of the trust agreements requires that:

"(B) Any individual Employer who is not a member represented by the Association with respect to said Collective Bargaining Agreements but who is a signatory to said Collective Bargaining Agreements * * * shall adopt this Agreement and Declaration of Trust by executing in writing and depositing with the Trustees his or its acceptance of the terms hereof in a form acceptable to the Trustees before such employer or his or its employees shall participate herein or benefit hereunder."

The amendments to the union contract recited that the Association:

" * * * entered into this amendment to the said Agreement for and on behalf of those of its members who are set forth in Appendix 'A' of the said Agreement * * *."

It was stipulated by counsel that defendant was not a member of the Association. There was no evidence that he ever deposited a written acceptance of the terms of the agreement and declaration of trust. The fact that the Association included defendant's name on Appendix "A" to the amendment does not itself make him a member. Indeed, the amendment recites that of the employers on the list, only those who are members are parties to the agreements as amended.

Having concluded that defendant was not a signatory to the collective bargaining agreements, his liability for payments to the health and welfare funds, if any, must rest on a finding of ratification. Whether it was error for the court below to direct a verdict in plaintiff's favor on the theory that defendant did ratify the agreements will depend upon whether reasonable men would draw conflicting inferences on the issue.

We find the following evidence on the question of whether defendant expressly or by his conduct ratified or intended to be bound by the collective bargaining agreements: With regard to the letter of April 17, 1959 authorizing the Aggregate Association to represent defendant in "negotiations" with the unions, a Mr. Eeds offered the following testimony:

"A Yes, Mr. Clark was trying to persuade Mr. Reeves to sign this, and by doing that, they wanted to present more or less of a united front for the coming negotiations, and Mr. Reeves didn't want to—he didn't belong to the association, and he kept refusing to sign it, because he was afraid it would keep him from either accepting or rejecting the final agreement on the contract.

"Mr. Clark assured him that it would not, it had nothing to do with that at all, that merely gave them the authority to use his name with the group that was in the association for the negotiations.

"And they shuffled the letter back and forth two or three times, and Mr. Reeves would look at it, and kind of hang his head down a little bit. I guess he was thinking or something, and he would give it back, and Mr. Clark would push it back toward him, and he would look at it again, and two or three times passed back and forth, and Mr. Clark kept assuring him that he would report to him upon the close of each one of the negotiations, meetings, what progress or what trend was going—had taken place during the meetings, and that all this letter was was their right to include him in for negotiations, but upon the close of the negotiations, what the Aggregate Association finally accepted between the Aggregate Association and labor, Mr. Reeves could either accept it or reject it personally at the time."

Both the agreement and the amendment recite that they were entered into for and on behalf of the members of the Association. Mr. Reeves received copies of each document and he testified that he read them. With this knowledge, he rejected the solicitations of the Association for his membership.

The testimony of Mr. Reeves was taken by way of deposition and read into evidence at trial. The following questions with their accompanying answers were propounded to him:

"Question: Were you signatory to the collective bargaining agreements with the Operating Engineers, the Teamsters and Laborers which expires on May 31, 1959?"

MR. KLEINDIENST: And we now have in evidence that letter.

MR. WARNER: We have an objection to that, your Honor, on the grounds it is irrelevant and immaterial.

THE COURT: Objection overruled. He may answer.

"Answer: You mean did I have a previous contract?

"Question: Yes.

"Answer: Yes.

"Question: All right. And you operated under these contracts, is that correct?

"Answer: Yes, but I signed a contract on that date."

* * * * * *

Q. "Mr. Reeves, based upon your past and present membership in the Teamsters Union, and based upon your experience as an operator and an employer in the sand and gravel industry, for the years that you have been in it, you know, based upon that experience, that the employees of yours who are members of the Operating Engineers Union and the Teamsters Union would not work for you unless you were signatory to a collective bargaining agreement, you know that, don't you?"

A. "As long as I pay union scale and get along with the members, I think they will work."

* * * * * *

"Question: With respect to your employment of the members of the Operating Engineers Union and the Teamsters Union, have you employed them pursuant to the standards of wages, hours, and working conditions set forth in that agreement, have you complied with the requirements of that agreement with respect—

"Answer: All except—

"Question: And I assume with the exception for the Health and Welfare payments?

"Answer: Yes.

"Question: Otherwise you have employed these members of the Operating Engineers Union and the Teamsters Union pursuant to the terms and conditions of that collective bargaining agreement other than the Health and Welfare Fund payments?

"Answer: Yes."

* * * * * *

"Question: Now, as a matter of fact, Mr. Reeves, in terms of relationship that you had with the unions and yourself, it was understood between you and the Operating Engineers Union and the Teamsters that you were operating pursuant to a union agreement, is that not correct?"

THE WITNESS: There is an objection there by Mr. Tipton.

"MR. TIPTON: Just a moment. May we have the time you are referring to?

"MR. KLEINDIENST: Question: From July 27, 1959, up to and including the present time.

"Answer: I agreed upon everything except the insurance."

Mrs. Reeves worked right along with her husband in the management of the company from its inception. She testified that she participated in the decision to sign the collective bargaining agreement of 1955. With regard to the 1959 agreement, she stated:

Q. "When the strike was over in July of 1959 and everybody went back to work, you yourself understood that you had collective bargaining agreements between your company and these unions, did you not?

A. "No.

Q. "You felt that you had no contracts with these unions?

A. "That is right."

The 1959 contract expired in 1962. As to defendant's relationship to the unions at that time, Mrs. Reeves testified as follows:

Q. "Did you sign a union contract in 1962, Mrs. Reeves?

A. "No, sir.

Q. "Are Mr. Eeds and the rest of the people working for you now even

though you don't have a union contract?

A. "Yes, sir.

Q. "Are you paying the same wage scale to them that everybody else in the industry gets, Mrs. Reeves?

A. "We are paying union scale.

Q. "Even though you don't have a union contract and wouldn't have to?

A. "Yes, sir."

The record also shows that an employee of defendant, one Mr. Coots, was instructed by Mr. Reeves to attend two Association meetings. At the meetings, the health and welfare plan was discussed, and at the latter, the agreements were approved. Coots did not vote and in fact he was instructed by Mr. Reeves· that· he could not vote because he was attending as a guest.

The record was absent any evidence that during the three years in issue was a single medical, death or other claim presented to either of the funds for the benefit of defendant's employees, or that a single employee was hired through either of the union halls. Reeves refused to make the required fund contributions or send in the required reports. Prior to the signing of the 1959 agreements, defendant undertook his own private welfare plan and continued to carry it afterwards. It was not disputed that he paid the prevailing union scale. On the other hand, the evidence indicated that all of defendant's employees were relatives or friends of Reeves and other employees.

██ If it was defendant's intention to affirm the collective bargaining agreements but not be subjected to the welfare plan obligations, he cannot escape liability. On the other hand, if it was his intention not to affirm the agreements unless he could do so without assuming their obligations, he cannot be held liable. See Restatement (Second), Agency § 96. We have examined the entire record sent to us on this appeal. After construing the evidence most favorably for defendant, Johnson v. Board of Education, 101 Ariz. 268, 419 P.2d 52 (1966); Sturm v. Heim, 95 Ariz. 300, 389 P.2d 702

(1964), it is our considered opinion that reasonable minds could differ on the inferences to be drawn therefrom.

Assuming, *arguendo*, that Reeves was in full possession of the· facts and circumstances surrounding the adoption of the agreements and amendments and thus was capable of affirmance, see O'Neil v. Goldenetz, 53 Ariz. 51, 85 P.2d 705 (1938); Gould Copper Min. Co. v. Walker, 17 Ariz. 332, 152 P. 853 (1915), the evidence is not conclusive with respect to defendant's intention. The testimony surrounding the letter of April 17, 1959 clearly establishes that he did not intend at that time to be bound by subsequent acts of the Association. · After the agreements were signed, Mr. Reeves unhesitatingly rejected the Association's solicitations for his membership and refused to make contributions to the funds. Both Mr. and Mrs. Reeves indicated by their testimony that they regarded their obligations to the unions as terminated ·after the expiration of the 1955 contract. We cannot assign to Mr. Reeves' testimony the conclusive construction given it by the court below. To construe his testimony to mean that he was giving his employees all the benefits that an employee would receive. under the collective bargaining agreement; but that he did not consider himself bound to do so, would be consistent with his conduct. The fact that his testimony consisted primarily of "yes"· and "no" answers to questions propounded by adverse counsel, we think, mitigates against the conclusive construction that plaintiffs would have us accept.

The evidence refutes any argument that defendant benefited by the collective bargaining agreement in that he received the work of his employees and was saved the expense of a strike. There is substantial evidence that Reeves' employees would have worked in the absence of a collective bargaining agreement. It was testified that during the industry-wide strike in 1959, Reeves' employees continued to report to work, they did repairs and they remained on the payroll. They continued to ·work for

Mrs. Reeves notwithstanding she was not signatory to a union contract in 1962. At least one of Reeves' employees knew defendant was not a signatory to the 1959 agreement.

■ Defendant also assigns as error the court's failure to join the Arizona Aggregate Association, as the designated trustee of the health and welfare plan, as an indispensable party to the action. The case of International Ladies' Garment Workers' Union, AFL v. Jay-Ann Company, 228 F.2d 632 (5 Cir. 1956) is cited as being identical to the case at bar and requiring such a holding. We cannot agree. Here the Association, by the trust agreement, designated three of its members to administer the trust. Furthermore, the original Arizona Aggregate Association Health & Welfare Fund was terminated in 1960 by an amendment to the collective bargaining agreement. The successor trust fund was designated in both the 1960 collective bargaining agreements and the 1960 agreement and declaration of trust, and as a successor trustee, the Sand, Rock, Ready-Mix Concrete and Asphalt Plant Health & Welfare Fund of Arizona could properly maintain actions which had accrued to the Arizona Aggregate Association Trust Fund. Scott, Trusts (2d ed.) § 280.8.

■ Defendant contends that plaintiffs are *improper parties to the actions and thus* have no standing to sue. This point was not raised in the answer or in any pre-answer motions. Rule 9(a) of the Arizona Rules of Civil Procedure, 16 A.R.S., provides, *inter alia:*

"When a party desires to raise an issue as to the legal existence of any party or the capacity of any party to sue or be sued or the authority of a party to sue or be sued in a representative capacity, he shall do so by specific negative averment, which shall include such supporting particulars as are peculiarly within the pleader's knowledge."

"If this issue is not raised by a motion before the answer is filed, it must be set forth in the answer as an affirmative defense. Defendant must be held to have waived his objection." Trico-Electric Cooperative v. Ralston, 67 Ariz. 358, 368, 196 P.2d 470, 476 (1958).

■ A denial of knowledge or information sufficient to form a belief as to plaintiff's authority or capacity to sue is insufficient to raise the issue of plaintiff's capacity to sue. Barron and Holtzoff, Federal Practice and Procedure § 301.

■■ Finally, we find no merit in defendant's assignments of error that the claims presented to the administratrix against the estate of Mr. Reeves were invalid because the written contracts upon which they were founded were not attached, and because they were signed by the attorneys for the fund, rather than the real parties. The purpose of a claim against an estate is to give the executor or administrator such information as will enable him to act upon the claim advisedly. In this case each claim had attached to it a copy of the complaint which contained the provisions of the contract relied upon. Furthermore, it would appear that the administratrix and her attorneys had copies of the contract. The fact that the claims were signed by the attorneys for the fund rather than the real parties does not render the claims fatal to due presentment. It is not necessary that the attorney set forth in a special statement the reason why the claim is being made by a person other than the claimant. Tangren v. Snyder, 13 Utah 2d 95, 368 P.2d 711 (1962). See also Richison v. Morris-Morton Drug Co., 182 Okl. 188, 76 P.2d 1069 (1938).

The judgment of the court below is reversed and the cause remanded for a new trial consistent with this opinion.

McFARLAND, V. C. J., and STRUCKMEYER and LOCKWOOD, JJ., concur.

BERNSTEIN, Chief Justice (dissenting).

I must dissent from the majority's disposition of this case, for I believe the trial

court correctly directed a verdict for the plaintiffs.

The test on appeal for determining the propriety of a directed verdict has been formulated by this court as follows:

"In determining this question we must, of course, construe the evidence most favorably for [the party against whom the verdict was directed] * * *, and if the evidence is of such a character that reasonable minds may differ as to the inferences to be drawn from the facts the case must be submitted to the jury." Swetnam v. F. W. Woolworth Co., 83 Ariz. 189, 191–192, 318 P.2d 364, 366 (1957). (There are a myriad of cases that follow this rule.)

As I see it, the evidence in this case can only support one reasonable conclusion— that, as a matter of law, Mr. Reeves ratified the collective bargaining agreement.

Perhaps the most crucial factor to be considered in determining whether the agreement was ratified by Mr. Reeves is his conduct in allowing the unions to believe that he was operating his plant under the collective bargaining agreement. Pertinent to this discussion is the following illuminating testimony in Mr. Reeves' deposition.

"Question: With respect to your employment of the members of the Operating Engineers Union and the Teamsters Union, have you employed them pursuant to the standards of wages, hours, and working conditions set forth in that agreement, have you complied with the requirements of that agreement with respect—

"Answer: All except—

"Question: And I assume with the exception for the Health & Welfare payments?

"Answer: Yes.

"Question: Otherwise you have employed these members of the Operating Engineers Union and the Teamsters Union pursuant to the terms and conditions of that collective bargaining agree-

ment other than the Health and Welfare Fund payments?

"Answer: Yes."

\* \* \* \* \* \*

"Question: Now, as a matter of fact, Mr. Reeves, in terms of relationship that you had with the unions and yourself, it was understood between you and the Operating Engineers Union and the Teamsters that you were operating pursuant to a union agreement, is that not correct?"

\* \* \* \* \* \*

"Answer: *I agreed upon everything except the insurance.*" (Emphasis added.)

This testimony clearly indicates that Mr. Reeves himself believed he had ratified the collective bargaining agreement. Whether he did not desire to be bound by the welfare fund provision is immaterial, for once he accepts the benefits of the contract he cannot refuse to live up to the contractual obligations.

"* * * if he * * * receives or retains benefits of, an unauthorized transaction with knowledge of the facts, such conduct constitutes an affirmance of the entire transaction irrespective of a manifestation of intent not to be bound by the liability it imposes, if the other party elects to treat it as such." Restatement of the Law, Agency 2d § 96.

More significant is the fact that Mr. Reeves permitted his company name to be used in the Association's "United Front" drive which further misled the unions. Since his company was the only sand and rock company allowed to operate during a strike in 1955 because of a contract with the unions, he must have been well aware that without a contract his company's operations would have been ground to a halt by a union strike.

The record clearly shows that Reeves never deviated from the collective bargaining agreement except with respect to payments into the welfare fund.

The majority emphasizes that all of Reeves' employees were either friends or relatives, and that they would have worked regardless of the existence of any agreement. This assumption, however, is clearly unwarranted by the evidence. The record shows that for years prior to 1959 a collective bargaining agreement was in force between the unions and Reeves Sand & Rock Company. If the employees were on such good terms with Mr. Reeves why did they need a contract between 1955 and 1959? Moreover, the fact that Reeves let the Association use his company name in their "United Front" drive indicates that he was contemplating the execution of a new collective bargaining agreement.

One additional fact should be noted. Mr. Reeves sent one of his employees to an Association meeting, at which time the collective bargaining agreement including the welfare fund provision was unanimously ratified. To give credence to the statement that the employee was only a guest and not allowed to vote is simply absurd. The record is clear that Reeves knew this meeting was called specifically for the ratification of collective bargaining agreements by nonmember companies. What other reasonable excuse could exist for sending his agent to the meeting?

As I see it, Reeves expected to reap the benefits of the contract by accepting the work of his employees together with the benefits and advantages of not having a strike, but he refused to comply with his obligation under the contract by failing to make the required payments to the welfare fund.

In Brandt v. Beebe, 332 S.W.2d 463 (Mo.App.1959), a similar case was before the Missouri court. In that case the employer refused to pay vacation benefits, but accepted the work of his employees. The court stated:

"The employees involved herein performed services under the written contract, which services defendant accepted. And the settled rule is 'that, although a written contract be not signed by one or both of the parties, the acceptance by one of the performance by the other will give validity to the instrument and impose on the acceptor the corresponding obligation provided therein.'" 332 S.W.2d at 466. (Citations omitted.)

The majority gives great weight to Mrs. Reeves' testimony to the effect that she never believed the company was bound by any contract. However, her testimony consists of self-serving statements that are contradictory of her husband's testimony. Certainly no credence can be given to statements of this sort during the time that her husband had the complete management and control of the business.

The majority also stresses that Mr. Reeves never became a member of the Arizona Aggregate Association. Yet I fail to see what relevance this has in determining the existence of ratification, for the collective bargaining agreement itself did not require that Reeves join the Association.

For my part, the evidence establishes as a matter of law that Mr. Reeves ratified the collective bargaining agreement.

I would affirm the judgment of the trial court.