584 P.2d 611

**Billy F. JONES and Virginia Jones (his former wife), Jere Martin and Mary Lou Martin (his former wife), and Richard C. Jones and Keva Jones (his former wife), Appellants,**

**v.**

**CPR DIVISION, the UPJOHN COMPANY, a Delaware Corporation, and Filbert Terrazas and Eloise Terrazas, his wife, Appellees.**

No. 1 CA–CIV 3486.

Court of Appeals of Arizona,
Division 1,
Department A.

July 27, 1978.

Rehearing Denied Aug. 28, 1978.

Review Denied Sept. 19, 1978.

Cunningham, Goodson & Tiffany, Ltd. by James P. Cunningham, Phoenix, for appellants.

Jennings, Strouss & Salmon by K. Layne Morrill and Leo R. Beus, Phoenix, for appellee CPR Division.

Wortman & Harrell, P.C. by Dennis J. Wortman, Ronald B. Fineberg, Kenneth A. Winsberg, Phoenix, for appellees Terrazas.

OPINION

NELSON, Judge.

Prior to February 21, 1972, appellees, Filbert and Eloise Terrazas (Terrazas), were the majority shareholders (74%) and managing officers of Terri-Flex Products, Inc. (Terri-Flex). Terri-Flex was engaged essentially in the sale and installation of roofing and insulation systems, and roofing components, primarily foam. Their principal material supplier was the other appellee

in this case, CPR Division of the Upjohn Company (CPR), with whom they had traded for several years on an open account, and to whom the sum of $100,000 was owed for materials.

On February 21, 1972, a promissory note was executed by Terri-Flex and Terrazas to CPR for $100,000. That note provided for installments to reduce the open account balance and further mandated that if Terrazas ceased to operate, or in any way disposed of the business without the consent of CPR, CPR could accelerate the note.

By August of 1972, as a result of additional materials purchases, Terri-Flex owed CPR $60,000 on its open account and $76,000 on the $100,000 note. In mid-August, representatives of CPR came to Phoenix to discuss the status of their relationship with Terri-Flex. Terrazas informed them that his failure to meet his obligations was due to business difficulties Terri-Flex was experiencing and his own ill health required him to reduce his role in the business.

Shortly after this meeting, Terrazas negotiated for the sale of his Terri-Flex stock to appellants Billy Jones, Richard Jones and Jere Martin (JJ&M), reached a tentative agreement, and executed a letter which provided that Terrazas agreed to convey his stock in Terri-Flex to JJ&M upon their payment of $55,000.

Subsequently, at Terrazas' request, representatives of CPR returned to Phoenix to negotiate with the potential purchasers regarding Terri-Flex' obligations to CPR. CPR became involved because the promissory note from Terri-Flex and Terrazas gave CPR the right to accelerate the balance of their promissory note if Terrazas sold the Terri-Flex business. After two days of negotiations, the parties entered into an agreement on August 31, 1972 which provided that CPR would waive its right to accelerate its note if certain conditions were met. Initially the purchasers agreed to make an immediate payment to CPR of $26,633.84. The agreement further provided that a new promissory note to CPR in the amount of $111,000 would be executed by the purchasers with Terrazas also per-

sonally liable to the extent of the first $76,000. In addition, the agreement provided that certain stock held by JJ&M be pledged as security on the note. The stock purchase price of $55,000 was also paid by JJ&M to Terrazas. After the consummation of this agreement, CPR continued to supply materials to Terri-Flex.

In the weeks following the assumption of the business by JJ&M, several events occurred which ultimately led to this litigation. In the sale between JJ&M and Terrazas, those parties agreed that no sale would occur if the accounts payable as of August 30th exceeded by more than 10% the accounts payable as of June 30th. The purchasers determined in the ensuing months that these accounts in fact exceeded 10% of the June 30th accounts. The other crucial event was JJ&M's discovery of revocation proceedings pending against Terri-Flex' contractor's license. In October 1972, the purchasers called in Mr. Terrazas and informed him of these difficulties, seeking to abandon the purchase.

In March of 1973, JJ&M defaulted on the promissory note and in April they wrote a letter to CPR and Terrazas indicating their formal intention to rescind the contract, based upon alleged misrepresentations made to them by Terrazas.

CPR filed suit in June of 1973 against Terrazas and the purchasers to enforce their promissory note, and JJ&M counterclaimed as to CPR and cross-claimed as to Terrazas, seeking rescission and claiming common law and securities fraud. The trial court dismissed the jury and directed a verdict denying JJ&M rescission and finding against them and Terri-Flex on the balance of the promissory note for $75,000 plus attorneys' fees. The court also entered judgment against Terri-Flex and ARM (the corporation which continued operating the Terri-Flex business with a newly acquired contractor's license) on the open account for $31,500 and against Terrazas and for CPR for $40,000, the remaining balance of his $76,000 liability, plus attorneys' fees on the note. The court also directed a verdict in favor of Terrazas and against JJ&M on the

150

cross-claim. JJ&M and Terrazas then perfected their appeals to this Court.[1]

At the outset, we note that Terrazas challenges this Court's jurisdiction over the case, due to some alleged defects in the filing of the notice of appeal. This Court, by motion, has previously ruled on the exact issue there raised, and this appeal is now before us in compliance with that ruling. We have reviewed the record in this regard and see no need to discuss the issue further.

While each party presents somewhat different questions to this Court for our consideration on appeal, we can capsulize them into one basic issue which we will discuss: was it error for the trial court to grant a directed verdict denying JJ&M rescission against both Terrazas and CPR?

## DIRECTED VERDICT

In the arguments before this Court, it was suggested that the jury on this case sat in a strictly advisory capacity and therefore their dismissal by the judge and his direction of a verdict were to be treated as the verdict of the trier of fact. Rule 39(k), Arizona Rules of Civil Procedure, 16 A.R.S., provides:

"Advisory jury and trial by consent. In all actions not triable of right by a jury the court upon motion or of its own initiative may try any issue with an advisory jury or, the court, with the consent of both parties, may order a trial with a jury whose verdict has the same effect as if trial by jury had been a matter of right."

Although this suit dealt, at least in part, with an equitable action seeking rescission, a jury was requested and one was convened. The court made no specific ruling on the capacity in which they would sit, however the law in Arizona makes their function clear. The cases overwhelmingly hold that "even in equity cases, where a jury has been demanded, the court may not withdraw the case from the jury's consideration if there are controverted issues of fact." *Slonsky v. Hunter*, 17 Ariz.App. 231, 496 P.2d 874 (1972). Therefore, if the court had been required to direct a verdict in a matter at law, it would be proper to do so in an equity action. *Han v. Horwitz*, 2 Ariz. App. 245, 407 P.2d 786 (1965). If, however, there were controverted issues of fact, as we find there were in part of the controversy before us, then such a direction would not be proper.

## RESCISSION—JJ&M v. TERRAZAS

Appellants JJ&M sought affirmative relief in this action against both Terrazas and CPR for rescission of their contract. The basis for the cross-claim against Terrazas was his alleged fraudulent misrepresentations and withholding of facts material to the sale. The elements which must be shown in Arizona to support an allegation of fraudulent misrepresentation have been set forth on numerous occasions and are as follows:

"(1) A representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) his consequent and proximate injury. *Carrel v. Lux*, 101 Ariz. 430, 434, 420 P.2d 564, 568 (1966);" *Jennings v. Lee*, 105 Ariz. 167, 461 P.2d 161 (1969).

As characterized by counsel at oral argument, this transaction was consummated in haste, probably undue haste precluding the necessary careful analysis of all facets of this business. However, the evidence indicated that complete disclosure of the company's financial position was probably not given. One answer in the transcript, while

1. Subsequent to oral argument, counsel for CPR and Terrazas filed a stipulation, pursuant to Rule 41(a), Rules of Civil Procedure, 16 A.R.S., with this Court. The stipulation dismissed the pending appeal as between Terrazas and CPR. For previous litigation concerning Terri-Flex Products, Inc., *see Arm, Inc. v. Terrazas*, 24 Ariz.App. 441, 539 P.2d 915 (1975); *Terrazas v. Superior Court*, 112 Ariz. 434, 543 P.2d 120 (1975).

perhaps not legally significant standing alone, exemplifies the nature of this transaction:

"MR. TERRAZAS: Mr. Cunningham, [counsel for JJ&M] if I would have told your clients all of the things you have brought up in the last three years in the litigation we have had here, we would have never made a deal. I would still be owning Terri-Flex."

JJ&M rely primarily for this action, however, on what they believe to be two crucial misrepresentations or omissions.

The contract of sale between Terrazas and JJ&M provided:

"That the Accounts Payable as reflected in the June 30, 1972, Balance Sheet do not increase more than 10% as reflected in the August 30, 1972 Balance Sheet. If they do, then this agreement can be terminated at the option of the undersigned."

In the trial court, JJ&M subpoenaed numerous creditors of Terri-Flex who testified that Terri-Flex owed them varying sums of money. Some of these creditors' bills appeared on neither the June nor the August balance sheets, and others appeared in amounts unrelated to what was actually owed. While it is difficult for this Court to determine to a mathematical certainty whether the discrepancy amounted to the 10% differential stipulated to in the contract, it is clear that the evidence would support such a finding by a trier of fact. The more important issue before us with regard to JJ&M's right to rescission is whether there was a substantial misrepresentation as to the actual accounts payable which the evidence disclosed, its materiality, and the fact that it was an inducing cause for the transaction. *Lehnhardt v. City of Phoenix*, 105 Ariz. 142, 460 P.2d 637 (1969).

The second crucial omission claimed stems from paragraph 2 of the contract between Terrazas and JJ&M:

"It is agreed by you that Mr. Terrazas will remain as Qualifying Agent in connection with the Contractor's License of the corporation for a reasonable period of time until another party can be qualified. It is further agreed that Mr. Terrazas will continue to manage the company as directed by the undersigned until such time as a lawful meeting is held and new officers and directors of the corporation are elected."

This agreement included a $21,000 salary for Mr. Terrazas as well as a year's contract and numerous fringe benefits.

Mr. Terrazas testified that his contractor's license had been revoked prior to the signing of this contract and an appeal was pending on that matter. He admits that he did not tell his auditors about that litigation, thereby keeping it off the financial report's litigation pending list which was given to JJ&M. He, however, adds: "I don't think it was done with any malice—"

While the testimony is in dispute, it appears that the Jones group found out that Terri-Flex' contractor's license was in jeopardy in late September, and they were subsequently told by the Registrar of Contractors that Terri-Flex would never be issued another license because of its many infractions and lawsuits. While it has been argued that the correlation between these misrepresentations and the buyers' damages was not sufficiently shown, a review of the evidence leads us to the conclusion that it was.

The most crucial concern this Court has—and presumably the trial court had with this theory of relief—is the length of time the appellants waited before seeking rescission. The case law is definite that "a party seeking to rescind a contract must restore or offer to restore to the other party that which he has received under the contract." *Jennings v. Lee, supra.* It is also clear that: "A contract of sale must be rescinded within a reasonable time under the existing circumstances. [Citation omitted]. What is a reasonable time is a question of fact for the trier of fact unless the facts are such that only one inference could be derived therefrom in which case it would become a question of law." *Mahurin v. Schmeck*, 95 Ariz. 333, 340, 390 P.2d 576, 580 (1964).

It is at this juncture that we believe the trial court erred in finding no arguable issue of material fact to go to the jury, and directed a verdict. The facts indicate that in late September and early October, JJ&M started to become aware of Terrazas' alleged misrepresentations. In the first part of October, the testimony reveals that the purchasers called Terrazas in to discuss these misrepresentations. According to the testimony of Billy F. Jones, that conversation went as follows:

"We told Mr. Terrazas at that point that we had met with Mr. Flickinger [Registrar of Contractors] and that he had said that the company had so many complaints and so many problems and so many lawsuits with the contractor's license board and that this particular one was in such gross violation that he would never allow us to have a license in the company of Terri-Flex again even though another licensing agent was substituted for Mr. Terrazas, and that even if I obtained a license, I couldn't even license Terri-Flex again, it couldn't be licensed; and that we wanted out of the deal because it was a bad deal; that we knew, having examined the records, we knew then that Mr. Terrazas had paid for the building that we were leasing from him with funds actually from the company instead of from himself and we suggested that he transfer the building to us—

\* \* \* \* \* \*

A. We suggested that he turn the building over to us to be sold so we could recover our funds and let him have his business back and he refused."

■ The law in Arizona holds that "[a]n actual surrender of the property by the vendee seeking rescission is not a prerequisite to a suit if he has offered to restore the property to the vendor. . . and the offer to surrender possession of property received under the contract need not be unqualified, but may be made condi-

tional upon the vendor's restitution of amounts paid on the contract, less proper allowances in respect of vendee's use of the premises." *Mahurin v. Schmeck*, 95 Ariz. at 341, 390 P.2d at 581.

Since our standard of review upon the grant of a directed verdict is to view all evidence in the light most favorable to the party against whom the verdict was directed, *Reeves v. Arizona Aggregate Association Health and Welfare Fund*, 102 Ariz. 595, 435 P.2d 829 (1967); *Heth v. Del Webb's Highway Inn*, 102 Ariz. 330, 429 P.2d 442 (1967), we must hold that reasonable minds could differ upon whether or not this was a proper offer to return the parties to the status quo under the circumstances and thereby permit rescission of the contract.[2] Therefore this issue must be retried.

■ Based on the aforementioned misrepresentations, an additional theory was advanced by JJ&M to support their claim for rescission. They claimed a violation of Arizona's securities regulations. A.R.S. § 44–1991 provides as follows:

§ 44–1991. Fraud in purchase or sale of securities

It is a fraudulent practice and unlawful for a person, in connection with a transaction or transactions within or from this state involving an offer to sell or buy securities, or a sale or purchase of securities, including securities exempted under § 44–1843 and including transactions exempted under § 44–1844, directly or indirectly to do any of the following:

1. Employ any device, scheme or artifice to defraud.

2. Make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

3. Engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit."

2. The purchasers additionally entered into evidence a letter tendered by them to the other parties in April, 1973 requesting formal rescission; it was perhaps on this notice that the court ruled as it did, however we believe that the earlier offer of rescission should also be placed before the jury.

The penalty for a violation of this statute as stated in A.R.S. § 44–2001 permits avoidance of the sale at the option of the purchaser. Recovery under the statute includes the reimbursement of payment for the securities, interest thereon, taxable court costs and reasonable attorney's fees with an adjustment for any income produced by ownership of the stock. Furthermore, the remedy is nonexclusive and an action may be maintained for common law fraud as well as statutory securities violation. A.R.S. § 44–2005; *Barnes v. Vozack*, 113 Ariz. 269, 550 P.2d 1070 (1976).

The most important question before us with regard to this claim is whether enough evidence was presented to create a question of fact under the statute sufficient to go to the jury.

We find that the two previously discussed misrepresentations were sufficient to maintain an action for common law fraud, breach of contract and statutory securities fraud, therefore these facts should have been placed before the jury. The jury would at that time also have to determine whether JJ&M's action in this case constituted a sufficient tender back of the securities under A.R.S. § 44–2001. *Bullard v. Garvin*, 1 Ariz.App. 249, 401 P.2d 417 (1965).

The trial court therefore erred in directing a verdict against JJ&M on the issue of a securities violation. *See Strom v. Black*, 22 Ariz.App. 102, 523 P.2d 1339 (1974); *Baker v. Walston & Company, Inc.*, 7 Ariz.App. 590, 442 P.2d 148 (1968).

## RESCISSION AS TO CPR

On several theories JJ&M argue that if they have a right to rescind against Terrazas, they can also rescind against CPR. These arguments are unpersuasive.

First, JJ&M contend that CPR was merely a third party beneficiary under this contract and therefore stands in no better position than Terrazas. This is an inaccurate assessment of the contract.

CPR in its suit sought to enforce a direct contractual relationship between itself and both JJ&M and Terrazas. CPR at the time of entering into the contract had the right to accelerate its promissory note and put Terri-Flex out of business. In consideration of this contract, it gave up that right and in return accepted the personal and corporate liability of both the purchasers and the sellers. To now say that they were not principals would be a revision of the contractual arrangements between the parties which we will not make. *Joy Enterprises, Inc. v. Reppel*, 112 Ariz. 42, 537 P.2d 591 (1975); *Goodman v. Newzona Investment Co., Inc.*, 101 Ariz. 470, 421 P.2d 318 (1966).

The second phase of JJ&M's argument that rescission against Terrazas would permit rescission against CPR is that the agreements between Terrazas and JJ&M for the sale of the business and JJ&M's agreement to assume liability to CPR are an "indivisible" or "entire" contract and that if the "part" relating to sale of the business is held invalid, the liability to CPR must also be invalid. We disagree.

■■■ Generally, a partial rescission is allowed where a contract is a divisible or severable one; however, on occasion a right of partial rescission may be upheld because the peculiar circumstances make it essential to a just result. It has also been said that in certain cases there may be a partial rescission where the point at which good faith ends and fraud begins clearly appears. *See Simmons v. California Institute of Technology*, 34 Cal.2d 264, 209 P.2d 581 (1949).

The court in *Simmons* went on to say that "the test of whether a contract is divisible is that if the consideration is single, the contract is entire, but if the consideration is apportioned, the contract may be regarded as severable." *Simmons*, 209 P.2d at 587, 588; *Traiman v. Rappaport*, 41 F.2d 336 (3rd Cir. 1930). "And a contract may be severable as to some of its terms, or for certain purposes, but indivisible as to other terms, or for other purposes." *Simmons*, 209 P.2d at 588; *In re Marshall's Garage, Inc.*, 63 F.2d 759 (2nd Cir. 1933); *Ireland v. Craggs*, 56 F.2d 785 (5th Cir. 1932); *Cosden Oil Co. v. Scarborough*, 55 F.2d 634 (5th Cir.

1932). *See also Mitzel v. Schatz,* 175 N.W.2d 659 (N.D.1970).

In *Reid v. Landon,* 166 Cal.App.2d 476, 333 P.2d 432 (1958), the California court set forth the factors we should consider in this transaction:

"Whether a contract is susceptible of division depends on its terms, the language employed, the subject matter covered, the nature and purpose of the agreement, its relation to other documents in the transaction and the intention of the parties as reflected in its terms." 333 P.2d at 438.

In considering these criteria, we find there to be no doubt that CPR gave separate consideration for its contract with JJ&M—forbearance from its right to accelerate the original note of Terrazas and Terri-Flex and permit the sale to go through. It was not a participant in the alleged misrepresentations of Terrazas and fully performed its part of this contract. No notice of rescission was received by CPR from Terrazas until several months after the inception of the contract when the corporation had changed its position in reliance thereon. This notice was given CPR months after JJ&M attempted to notify Terrazas of their intent to rescind.

Under all the circumstances of this transaction, we find the contract divisible as to CPR. Therefore we affirm the trial court's directed verdict in favor of CPR on the note against JJ&M, since all of the other factors involved, default, amount due, etc., are not questioned in the evidence.

### CONCLUSION

As to the appellants, JJ&M, and the appellees, Terrazas, the judgment of the trial court is reversed and the cause remanded for a new trial consistent with this opinion. As to the appellants, JJ&M, and the appellee, CPR, the judgment of the trial court is affirmed.

HAIRE, P. J., and FROEB, C. J., concurring.